### WASHINGTON LIFE INS. CO. et al. v. LOVEJOY et al. †

(Court of Civil Appeals of Texas. Galveston. April 22, 1912. Rehearing Denied May 9, 1912.)

1. INSURANCE (§ 237*)—TRANSFER OF CONTRACTS BY INSURER—SUFFICIENCY OF EVIDENCE.

Evidence in an action by a policy holder to recover premiums and damages for breach of the insurance contract, including plaintiff's correspondence with the original insurer and with another insurance company, *held* sufficient to support a finding that the original insurer had transferred all of its assets to the other company, and that the two companies had been consolidated.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

2. INSURANCE (§ 237*) — PREMIUMS — ACTION FOR RECOVERY—SUFFICIENCY OF EVIDENCE.

Evidence in an action for the recovery of premiums and for damages for the insurer's breach of its contract *held* sufficient to sustain a finding that the correspondence between plaintiff and the original insurer directed plaintiff to look to a reinsuring company for all information touching his rights.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

3. INSURANCE (§ 237*) — PREMIUMS — ACTION FOR RECOVERY — EVIDENCE — ADMISSION BY INSURER.

Evidence in an action for the recovery of premiums and for damages for the insurer's breach of its contract *held* sufficient to sustain a finding that the insurer's president admitted to plaintiff that the insurer had gone out of business.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

4. INSURANCE (§ 237*) — PREMIUMS — ACTION FOR RECOVERY—SUFFICIENCY OF EVIDENCE— INSURER'S ABANDONMENT OF POLICY.

In an action by insured to recover premiums and damages for the insurer's breach of contract, evidence *held* sufficient to sustain a finding that the original insurer had virtually abandoned the performance of its contract by the complete cessation of its business, the transfer of practically all of its assets, and by efforts to compel plaintiff to accept another insurance company in its place.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

5. INSURANCE (§ 237*) — PREMIUMS — ACTION FOR RECOVERY—INSURER'S BREACH OF CONTRACT.

Where the original insurer assigned its policies, transferred its assets, shifted to another company its obligation to an insured, and placed it beyond its own power to perform such obligation, except so far as it could compel performance by such other company, there was a breach of its contract entitling the insured to a recovery; and that the assignee was solvent and able and willing to carry out the original contract did not prevent a breach of such contract.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

6. INSURANCE (§ 144*) — REINSURANCE OR TRANSFER BY INSURER — CONSENT OF INSURED.

It is not within the power of an insurer, against the consent of the insured, to substitute another insurer in the carrying out of its undertakings.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 273–275; Dec. Dig. § 144.*]

7. INSURANCE (§ 237*)—BREACH OF CONTRACT BY INSURER—REMEDY OF INSURED—ACTION FOR DAMAGES.

On breach or repudiation of its contract by the insurer, the insured, during his lifetime, has a present right of action for the recovery of damages.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

† Writ of error denied by Supreme Court June 26, 1912.

8. INSURANCE (§ 147*) — CONSTRUCTION OF CONTRACT — PROVISION RELATING TO CONSTRUCTION.

A provision in a policy issued to a holder in this state that the contract contained therein and in the application should be construed according to law of the state of New York, and that the place of the contract was agreed to be the home office of the company in New York, simply provides a rule of law for the construction of the contract, and has no application to an action predicated upon the breach of the contract by the insurer, not involving any construction of the agreement contained therein.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 293; Dec. Dig. § 147.*]

9. INSURANCE (§ 237*)—ACTION TO RECOVER PREMIUMS—PLEADING—FOREIGN LAW.

Where an insurer, sued in this state for the recovery of premiums and for damages for breach of its contract, relies upon the law of another state in the assertion of its defense, it is incumbent upon it to plead and prove such law.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

10. EVIDENCE (§ 80*)—PRESUMPTIONS—LAWS OF OTHER STATES.

In the absence of proof, the law of another state will be presumed to be the same as the law of this state.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. § 101; Dec. Dig. § 80.*]

11. APPEAL AND ERROR (§ 934*)—REVIEW—PRESUMPTIONS—FINDING TO SUPPORT JUDGMENT.

Where the evidence in an action for the recovery of premiums and for damages for an insurer's breach of its contract warranted a finding that at the time of such breach the insured, on account of his changed physical condition, was unable to obtain life insurance in other desirable and solvent companies, it will be presumed in support of a judgment for the insured that such finding was made.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3777–3781, 3782; Dec. Dig. § 934.*]

12. INSURANCE (§ 237*)—PREMIUMS—ACTION TO RECOVER—MEASURE OF DAMAGES.

The measure of damages in an action by an insured to recover premiums and damages for the insurer's breach of its contract is the amount of the premiums paid by the insured, with 6 per cent. per annum interest from their several dates of payment.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

13. COURTS (§ 92*)—RULES OF DECISION—OBITER DICTUM.

A statement as to a question of law not before the court for decision is obiter dictum and not binding.

[Ed. Note.—For other cases, see Courts, Cent. Dig. § 335; Dec. Dig. § 92.*]

14. INSURANCE (§ 144*) — REINSURANCE OR TRANSFER OF POLICIES — LIABILITY OF TRANSFEREE.

In an action by an insured for recovery of premiums and for damages for the original insurer's breach of its contract, the defendant company which had taken over the contracts and assets of the original company and had assumed its obligations was liable.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 273–275; Dec. Dig. § 144.*]

15. INSURANCE (§ 198*) — REVIEW — PARTIES ENTITLED TO ALLEGE ERROR.

An insurer, after judgment for the insured for a return of premiums and for damages for its breach of contract, cannot complain of error in rendering judgment wholly in favor of the insured and not in favor of his children, who were beneficiaries in the policy, where the judgment rendered fully protects it against any claim of the beneficiaries; error in such respect, if any, being assignable, only by the beneficiaries.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 457–467; Dec. Dig. § 198.*]

Appeal from District Court, Harris County; Norman G. Kittrell, Judge.

Action by John Lovejoy and others against the Washington Life Insurance Company and another. Judgment for plaintiff named, and defendants appeal. Affirmed.

Frank Ewing, of Pittsburgh, Pa., and Carlton, Townes & Townes, of Houston, for appellants. Andrews, Ball & Streetman, of Houston, for appellee.

McMEANS, J. This suit was instituted by John Lovejoy, on his own behalf and as next friend for his minor children, against the Washington Life Insurance Company and the Pittsburg Life & Trust Company to recover certain premiums paid by him upon a policy of life insurance issued to him by the Washington Life Insurance Company, together with 6 per cent. interest per annum upon each premium from the date of its payment, and in which policy the minor children of the said Lovejoy were named as beneficiaries. Recovery is sought against the Washington Life Insurance Company upon the ground that, after the said Lovejoy had paid premiums for about 10 years, it had repudiated and broken its contract with him; and recovery was asked against the Pittsburg Life & Trust Company on the ground that it had assumed to pay the obligations of the Washington Life Insurance Company, and on the further grounds, in the alternative, that it (the Pittsburg Life & Trust Company) had acquired all, or the substantial part, of the assets of the Washington Life Insurance Company; that there was a merger of said corporations, and an absorption by the Pittsburg Life & Trust Company of the property, business, and franchises of the Washington Life Insurance Company.

In the alternative, plaintiffs prayed that, if they were denied a return of the premiums with interest, they be awarded a judgment for the actual value of the policy with interest thereon from the date of its breach, which actual value was alleged to be $5,000. The petition by its terms sought a recovery solely in favor of plaintiff John Lovejoy, but prayed in the alternative for a joint judgment for all the plaintiffs in the event it should be found that he was not entitled to a recovery for himself alone.

Defendants answered by general denial. The case was tried before the court without a jury, and judgment was rendered in favor

of John Lovejoy alone against both defendants for the sum of $4,825, with interest from February 20, 1911, at the rate of 6 per cent. per annum. The court, upon proper request, filed its findings of fact, and upon such findings based the conclusions of law that the Washington Life Insurance Company had broken its contract with plaintiff John Lovejoy, and that he had a right to recover damages by reason of said breach of contract, which damages the court found to be the premiums. paid by him, with 6 per cent. per annum interest from their several dates of payment. The court further found that the Pittsburg Life & Trust Company, having expressly assumed all liabilities of the Washington Life Insurance Company, and, in addition, having in effect absorbed said company, and acquired practically all of its assets, was liable to plaintiff for the same amount. From the judgment against them both, defendants have appealed.

[1] Appellants by their first assignment of error complain that the court erred in its finding to the effect that the correspondence between Lovejoy and appellants showed that the Washington Life Insurance Company had transferred all of its assets to the Pittsburg Life & Trust Company, and that the two companies had been consolidated; and they contend in this contention that the contracts between the two companies, and the undisputed testimony of the witnesses Baldwin and Mahan, showed that the companies had not been consolidated; that all of the assets of the Washington Life had not been transferred to the Pittsburg Company, and that such evidence showed that the Washington Life retained a portion of its assets; that it took collateral security amounting to about $18,000,000 to secure the agreement of the Pittsburg Company to protect the obligations existing and that might come into existence against the Washington Life Insurance Company.

Looking to the correspondence alone, the conclusion is irresistible that there was at least a consolidation of the two companies, if not an absorption of the Washington Life by the Pittsburg Company. Preliminary to a discussion of the correspondence, we may say that the undisputed proof shows that the policy in question was issued by the Washington Life to John Lovejoy on August 30, 1899, and from that time down to and including the 30th day of November, 1908, Lovejoy regularly paid the premiums of $360 a year in four equal installments, aggregating $3,420. Up to the time of the payment of the last quarterly installment, Lovejoy conducted all of the transactions relating to said policy with the Washington Life, and this company regularly sent him notices in advance of the maturity of the premiums, and he made the payments directly to it.

About February 7, 1909, Lovejoy received from appellant Pittsburg Life & Trust Company a letter in which was inclosed a printed slip dated February 5, 1909. This slip contained the information that the Pittsburg Company had assumed all of the liabilities of the Washington Life, and requested the insured to consent to the arrangement which had been made between said companies, and to sign an agreement at the bottom of the slip which, in effect, was an agreement to transfer the plaintiff's insurance from the Washington Life to the Pittsburg Company. On February 13, 1909, Lovejoy wrote a letter to each of the companies. In his letter to the Washington Life he stated that he had received a communication from the Pittsburg Company announcing that the former had reinsured his policy in the latter, which had taken over all risks of the Washington Life, and asking if the Washington Life was going or had gone out of business, and if it had been absorbed by the Pittsburg Company, and asking further if arrangements had been made to pay the cash value of his policy. He stated: "I don't care for my policy to be reinsured in any other company." In his letter to the Pittsburg Company he acknowledged receipt of its letter and of the inclosed certificate, and stated that he had written to the Washington Life that he did not care to have the policy reinsured or carried any further, and asking to be informed of the present cash surrender value of his policy. On February 19, 1909, the Washington Life replied to Lovejoy's letter, its reply containing the following statements: "Would say that the Pittsburg Life & Trust Company has purchased practically all of the stock of the Washington Life Insurance Company, and it would naturally follow that the business of the two companies would be consolidated." The letter also referred to a statement inclosed, showing an examination of the Pittsburg Life & Trust Company by the insurance department of Pennsylvania, which was sent in answer to Lovejoy's request for information. This statement contained the following: "On December 30, 1909, articles of agreement were entered into between the Pittsburg Life & Trust Company of Pennsylvania and the Washington Life Insurance Company of New York, by which the Pittsburg Life agreed to assume all liabilities of the Washington Life in consideration of the latter company turning over all of its assets to the former corporation." At the end of its letter the Washington Life says: "The Pittsburg Life & Trust Company will be glad to give you any information you may desire in regard to your policy." This is the last written communication of any kind received by Lovejoy from the Washington Life Insurance Company. Some further correspondence ensued between Lovejoy and the Pittsburg Company, with the purpose on the part of the plaintiff to ascertain what settlement

he would be entitled to in case he decided to surrender his policy. No settlement, however, was made, and nothing was done by either company in reliance upon any statement made by Lovejoy. On March 6, 1909, Lovejoy again wrote to the Pittsburg Company, his letter containing the following: "First, I want to state distinctly and unequivocally that I never agreed and do not agree that my policy shall be transferred by the Washington Life Insurance Company to any other company, and do not agree that your company shall take it over. That is what I want distinctly understood first."

About the 1st of March, 1909, Lovejoy was notified by the Pittsburg Company that he had failed to pay the premiums due on his policy February 28th. On March 13th, a further notice was sent to him by the Pittsburg Company demanding payment of the premium by the insured to that company, and later, in the same month, the Pittsburg Company notified Lovejoy that, because of his failure to pay the premium due February 28th, his policy had been canceled; and subsequently this company again wrote Lovejoy offering to reinstate him on certain conditions.

We think this evidence entirely sufficient as a basis for the court's findings that there had been a consolidation of the two companies. But appellants contend, as we understand, that, notwithstanding the correspondence, the contracts entered into between the two companies, together with the testimony of the witnesses Baldwin and Mahan, conclusively show that there was no consolidation.

The original contract between the two companies, of date December 30, 1908, is as follows: "Whereas it is the purpose of this agreement to more effectively secure to the policy holders of the Washington Life Insurance Company the payment of their policy contracts already matured or which may mature hereafter according to their terms and conditions, and to further conserve the interests of the policy holders of the said Washington Life Insurance Company by reducing expenses incident to the handling of the said business through uniting it with that of the Pittsburg Life & Trust Company, and to these ends transfer sufficient money and other assets as a consideration for the reinsurance and assumption of the policy contracts and other obligations hereinafter mentioned, to enable the said Pittsburg Life and Trust Company to carry out said contracts and obligations so reinsured and assumed. Now, therefore, in consideration of the reinsurance in and assumption by the Pittsburg Life and Trust Company of all the liabilities of the Washington Life Insurance Company to its living policy holders in good standing of any kind or nature whatsoever, as evidenced by the policies now in force, and also in consideration of the assumption

149 S.W.—26

of all unpaid death claims and all policy and other liabilities, including all liabilities under contracts with its agents, the said Washington Life Insurance Company hereby sells, assigns, transfers and sets over the properties, securities and moneys set forth in the lists attached to this agreement, made a part hereof and marked Exhibits A, B, and C, all books and papers relating to policy holders, all due and accrued interests, all due and accrued rents, all due and deferred premiums, all loans and notes of any kind or nature whatsoever, all agents' balances and all furniture and fixtures owned by the said Washington Life Insurance Company, and all the right, title and interest in all premiums or other sums hereafter payable to the said Washington Life Insurance Company upon or by reason of any and all such policy and other contracts hereby reinsured and assumed, agreeing to pay over to the said Pittsburg Life and Trust Company all such premiums or other sums as and when the same shall be so received; and the said Washington Life Insurance Company hereby further agrees to execute all deeds, assignments or other instruments that may be necessary to convey the property intended to be conveyed by this agreement and to effectuate the provisions of this agreement. In consideration of the said transfer of assets the Pittsburg Life and Trust Company hereby reinsures, assumes and agrees to pay all the liabilities of the Washington Life Insurance Company to its living policy holders in good standing of any kind or nature whatsoever, as evidenced by its policy contracts now in force, and also to assume the payment of all the unpaid death claims and of all policy and other liabilities of the Washington Life Insurance Company, all liabilities under contracts with the agents of the Washington Life Insurance Company, paying all such liabilities directly, or, in the event of the said Washington Life Insurance Company shall have paid the same, reimburse it such amount or amounts on request. This contract shall be effective and binding on both parties, their successors and assigns, immediately upon the execution of the same."

Acting under this agreement, the Washington Life Insurance Company turned over to the Pittsburg Life & Trust Company all of its assets, amounting to about $20,000,000 in value, except about $25,000. Of this amount about three-quarters of $1,000,000 was in cash, and this has ever since been retained by the Pittsburg Company. At the time of making the contract of December 30, 1908, the Pittsburg Company was not licensed to transact business in the state of New York, under the laws of which state the Washington Life was organized, and on this account the insurance superintendent of that state made objection to this arrangement, whereupon, to meet the objection made, another contract, of date January 11, 1909, whereby the Pittsburg Company agreed to and did de-

posit some $17,000,000 or $18,000,000 worth of assets with the Washington Life to be held by it in the state of New York as collateral security for the carrying out of the contract of December 30, 1908. After this the Pittsburg Company was granted a license to do business in the state of New York. Before this, however, and while application for a license was pending, another contract was made between the two companies at the suggestion of the insurance superintendent of New York, by which the Pittsburg Company continued to carry on deposit with the Washington Life in New York, and as collateral security, the above-mentioned assets, which were sufficient to cover the entire legal reserve on the reinsured policies. This last contract is dated June 23, 1909. It seems to be admitted that since the execution of the contract of December 30, 1908, the Washington Life has not written and has not tried to write or issue any new policies.

The following facts found by the trial court, which are not objected to by appellants, will be taken as true, and are hereby adopted in this connection: "The testimony of the officers of the defendants discloses the following pertinent facts: (1) That the same persons have been the officers of both companies practically ever since the so-called reinsurance contract was entered into. (2) That of over $20,000,000 of assets, the Washington Life Insurance Company transferred all except some $25,000 of assets to the Pittsburg Company. (3) That, while there had been a pretended transfer of a large part of the assets of the Washington Life Insurance Company, all of these assets pretended to have been so transferred are in the custody of six persons, five of whom are expressly shown to be agents of the Pittsburg Life & Trust Company. (4) That since the first agreement was entered into between these companies, the Washington Life Insurance Company has written no new business, and that practically all of the premiums upon its old business have been collected by the Pittsburg Life & Trust Company. (5) That, while the Pittsburg Life & Trust Company maintains a large and complete force of officers, assistants, and employés, the Washington Life Insurance Company has .only a small number of officials, and these are persons whose time appears principally employed by the Pittsburg Life & Trust Company, and who only give·attention incidentally to the business of the Washington Life Insurance Company."

In view of the foregoing facts, we think the court was justified in finding that there had been a consolidation of the two companies. There is nothing in the testimony of the witnesses Baldwin and Mahan, which we have examined carefully, that would compel a contrary conclusion.

[2] The second assignment complains that the court erred in finding as a fact that the correspondence between Lovejoy and the Washington Life Insurance Company showed that Lovejoy must look to the Pittsburg Life & Trust Company for all information touching his rights. The court's finding is that in the correspondence the Washington Life distinctly stated "that for further information with reference to his policy, the plaintiff must look to the Pittsburg Life & Trust Company." While there was no such distinct statement made, we think such an inference is justified by the statement contained in the letter from the Washington Life to Lovejoy, wherein it says, "The Pittsburg Life & Trust Company will be glad to give you any information you desire in regard to your policy," when' considered with the further fact that, after the letter in which this statement is contained was written, the Washington Life never communicated again in writing with Lovejoy. But, however that may be, we think, in view of our findings above, the finding of the court complained of is of no controlling force in the determination of this appeal.

[3] The third assignment complains that the court erred in its finding of fact to the effect that W. C. Baldwin admitted to Lovejoy that the Washington Life had gone out of business. The finding of fact complained of in this assignment is: "After the institution of this suit, W. C. Baldwin, president of both companies, came to Houston to see the plaintiff with reference to the matter in controversy, and in conversation with. him admitted the facts to be that the Washington Life Insurance Company had gone out of business, that it was writing no new business, and that it ceased to be a going concern."

In the statement made by appellants under this assignment they state that Lovejoy testified on direct examination that in the conversation with Baldwin he (Baldwin) stated that the Pittsburg Life & Trust Company had taken over the assets of the Washington Life, and that the latter had practically gone out of business, had ceased to be a going concern; that Baldwin said it had gone out of business; that it was not writing any more policies, etc. On cross-examination the witness said that in this conversation he understood Baldwin to say that the Washington Life was not writing any new insurance business; that he thought Baldwin said, in substance, that the Washington Life was going out of business entirely—cease to exist; that he did not say that the Washington Life had ceased its corporate existence; that he said it had ceased to be a going concern, etc. We think this evidence warranted the finding complained of.

[4] The court found that the Washington Life Company had virtually abandoned the performance of its contracts by the com-

plete cessation of the business for which it was incorporated, and the transfer of practically all of its assets to another company, and by its efforts to compel the appellee Lovejoy to accept the Pittsburg Life & Trust Company as his insurer. This finding is assailed by appellants; their contention being that the contracts introduced in evidence and the testimony of Mahan and Baldwin show conclusively that the Washington Life Insurance Company was to and did continue its corporate existence; that it was not intended at the time that the contracts were made that it should continue to write new policies, but it was to keep up its corporate existence and hold as collateral and keep in New York $18,000,000 worth of assets to secure its policy holders.

The evidence shows that, after the execution of the contract between the two companies on December 30, 1908, the Washington Life, agreeably to the terms thereof, turned over to the other company nearly all of its assets, amounting to about $20,000,000 in value, including cash on hand amounting to about three-quarters of $1,000,000 and all its business, and from that time, while not surrendering its corporate existence, ceased to do further business as a life insurance company, and from thence was no longer a going concern. It did reserve, however, a small portion of its assets, amounting to about $25,000 in value. Notwithstanding Lovejoy's want of consent and his positive refusal to agree that his policy should be transferred, it is inferable that it was nevertheless transferred to the Pittsburg Company, for we find that the Washington Life never after the execution of said contract made any demand upon Lovejoy for the payment of the premiums or in any way demanded the performance by him to it of his contract, but, on the contrary, the record shows that, after the date of the contract, the Pittsburg Company assumed to act in the premises as if it had issued the policy; and it was this company that notified Lovejoy that he had failed to pay the premium due February 28, 1909, and later demanded payment thereof to it, and still later assumed the right to cancel the policy, and after this offered to reinstate it on condition that Lovejoy submit to a physical re-examination and furnish a satisfactory physician's certificate on a form which it sent him. It is inferable from the testimony that at the time of this attempted cancellation and offer to reinstate the policy Lovejoy's health had become impaired to such a degree that he could not obtain other insurance, and that therefore he could not have furnished a certificate from a physician that would have been satisfactory, but this matter will be more fully discussed in passing on a succeeding assignment of error. We think the facts are sufficient to prove a breach by the Washington Life of its insurance contract

with Lovejoy, and that this breach occurred when the Washington Life, after the execution of the contract of December 30, 1908, delivered to the Pittsburg Company, in conformity with the terms thereof, its assets and business and ceased to be a going concern, and that this breach was not healed by the subsequent contracts made between the two companies and the delivery to the Washington Life securities amounting to some $17,000,000 or $18,000,000 in value as collateral security to secure the performance of the undertaking of the Pittsburg Company. It appears that this transfer was merely a technical transfer made to meet a technical objection on the part of the superintendent of insurance of the state of New York, and that in fact the full control and disposition of these assets or securities was in the Pittsburg Company. The assignment is overruled.

What we have said in disposing of the fourth assignment necessarily disposes of the fifth, sixth, and seventh assignments adversely to the contention of the appellants.

[5] The eighth and ninth assignments complain of the court's conclusion of law that the Washington Life had breached its contract with Lovejoy. It necessarily follows from what we have before said that these assignments must be overruled. It is clear, we think, that, by the terms of the contracts entered into between the two companies, and by the other evidence referred to, the Washington Life had, in so far as it could by the contract of December 30, 1908, and by the transfer of its assets, shifted to another company the obligations to Lovejoy which it had assumed by its contract with him, and had placed it beyond its power to perform these obligations except in so far as it could compel performance by such other company. That the Pittsburg Company was solvent and able and willing to carry out the contract made by the Washington Life with Lovejoy did not less render it a breach of the contract when the latter placed it beyond its power to fulfill its obligation.

[6] It was not within the power of the Washington Life against Lovejoy's consent to substitute the Pittsburg Company in the carrying out of its undertaking. Lovell v. St. Louis Mutual Life Ins. Co., 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 423; Menger v. Ward, 87 Tex. 622, 30 S. W. 853; Meade v. St. Louis Mutual Life Ins. Co., 51 How. Prac. (N. Y.) 1.

[7] By their tenth assignment appellants complain that the court erred in its conclusion of law to the effect that, the contract being breached, Lovejoy was entitled to recover damages. They contend by their first proposition under this assignment that a repudiation by a life insurance company of a policy contract during the lifetime of the insured does not amount to a breach entitling the insured to recover damages. By

a second proposition they claim that there can be no anticipatory breach of a policy of life insurance during the life of the insured, that the Washington Life had agreed to pay a certain sum upon the death of Lovejoy, and that a wrongful repudiation of that contract would not give him a present right of action for damages. They contend that, upon such repudiation being made, he might have discontinued the payment of premiums, but he could not sue for damages; that a cause of action would not arise until after his death; that he might have tendered the premiums and sued in equity to compel recognition of the contract, but he could not predicate a suit on the theory that the contract was breached. In overruling this assignment we think it sufficient to say that we are justified in so doing by the authorities cited by us in disposing of the eighth and ninth assignments.

The eleventh assignment is as follows: "The court having found as a fact that by agreement between Lovejoy and the Washington Life Insurance Company it was provided that the policy involved in this litigation should be construed according to the laws of the state of New York, the place of said contract being agreed to be the home office of said company in New York, and it being made to appear that under the laws of the state of New York there could be no anticipatory breach of a policy of life insurance, and that no action in damages would be on account of any repudiation or breach of said contract until the death of the assured, it was error on the part of the court to find and hold that the plaintiff Lovejoy could recover any sum of money by way of damages."

The twelfth assignment is to the effect that the decisions of the state of New York construing policies of life insurance companies and fixing and defining the rights of policy holders thereunder, and construing and fixing the rights of policy holders on account of any breach thereof, is a part of the laws of the state of New York, of which the courts of Texas will take judicial knowledge.

[8] The provision of the contract relied upon is as follows: "That the contract contained in such policy and in this application shall be construed according to the law of the state of New York; the place of said contract being agreed to be the home office of the company." This language simply provides a rule of law for the construction of the contract. It is evident that the parties were not providing for the contingency of a breach of the contract, nor stipulating that the general rule of law should not govern in case of a breach; and we are of the opinion that this clause of the contract has no application whatever to an action predicated upon a breach of the contract and not involving any construction of the

agreement contained therein. We think this is a sufficient answer to the assignment. But we need not stop here.

[9] If appellants relied upon the law of the state of New York in the assertion of any right based upon their claim that there could be no anticipatory breach of a policy of life insurance, it was incumbent upon them to plead and prove it. Blethen v. Bonner, 93 Tex. 143, 53 S. W. 1016. No such law of that state was proved.

[10] Our Supreme Court has held that, in the absence of proof, the law of another state will be presumed to be the same as our own. Tempel v. Dodge, 89 Tex. 71, 32 S. W. 514, 33 S. W. 222; James v. James, 81 Tex. 381, 16 S. W. 1087; Bradshaw v. Mayfield, 18 Tex. 30; Armendiaz v. Serna, 40 Tex. 291; Crosby v. Huston, 1 Tex. 203. The Texas courts seem to recognize the doctrine of an anticipatory breach of an executory contract such as the contract under consideration. American Legion of Honor v. Batte, 34 Tex. Civ. App. 456, 79 S. W. 629; Supreme Lodge v. Neely, 135 S. W. 1046. The assignment is overruled.

[11, 12] The thirteenth assignment complains that the court erred in holding, as a matter of law, that the measure of plaintiff's damages was the premium paid by him with interest thereon from the dates of the several payments, and they contend in this connection that, if appellee is entitled to recover at all, he can only recover the value of the policy with interest from the time of the breach, and that the value of a nonparticipating policy, such as was held by Lovejoy, is measured at any given time by the unused portion of the premium at such time. On the other hand appellees contend (1) that, where an insurance company agrees to pay a stipulated amount to the beneficiary named in a policy and breaches the policy in a material part after a number of premiums have been paid, the measure of damages is the amount of the premiums paid, with interest from the several dates of payment; and (2) if such is not the proper measure of damages in any case, it is a proper measure in a case where it is alleged and proved that, after the policy was issued and at the time and after it was breached, the insured has been unable to procure insurance in other companies.

Plaintiffs alleged "that at the time of and since said breach of said contract plaintiff John Lovejoy, by reason of his age and physical condition, was and has been unable to obtain life insurance in other desirable and solvent life insurance companies." On the trial he testified on this point as follows: "I know whether or not there has been any such change in my physical condition as would make it impossible for me to obtain life insurance in regular companies now. Before January, 1909, I applied twice for life insurance and have been rejected on ac-

count of my physical condition. That has been within the last five years." On cross-examination he testified: "I think that was about 1908; that is, I tried before that to get some. I have never been examined for any policy since that time, since 1908; I don't think I have; I may have, but don't think I have; if I have, I have forgotten it. I think it was about a year and a half prior to that time, about two years, about 1906 or 1907, that I was last examined before that. I made application to take a $25,000 policy in a new company organized, not organized on the old line plan, but some new plan which I thought might be safe. I was willing to take a chance on it, but they turned me down; they refused to give me the policy." We think this testimony warranted the finding that, at the time the Washington Life breached its contract with Lovejoy, the latter, on account of his changed physical condition, was unable to obtain life insurance in other desirable and solvent insurance companies.

The proper measure of damages in a case of the breach by an insurance company of a life insurance policy issued by it has long been the subject of much discussion by, and difference of opinion among, the courts of the various states. In 19 American & English Encyclopedia of Law, 99, it is said: "Where, in such case, the insured elects to treat the policy at an end, he is entitled, according to the weight of authority, to recover back all the premiums that he has paid, with interest on each premium from the date it was paid." This rule seems to be sustained by the following authorities: Van Werden v. Equitable Assurance Society, 99 Iowa, 621, 68 N. W. 892; American Life Ins. Co. v. McAden, 109 Pa. 399, 1 Atl. 256; Alabama Gold Life Ins. Co. v. Garmany, 74 Ga. 51; McKee v. Phœnix Ins. Co., 28 Mo. 383, 75 Am. Dec. 129; McCall v. Phœnix Mut. Life Ins. Co., 9 W. Va. 237, 27 Am. Rep. 558; Frain v. Metropolitan Life Ins. Co., 67 Mich. 527, 35 N. W. 108; Ætna Life Ins. Co. v. Paul, 10 Ill. App. 431; Braswell v. American Life Ins. Co., 75 N. C. 8; March v. Insurance Co., 186 Pa. 628, 40 Atl. 1100, 65 Am. St. Rep. 887. And see A. L. of H. v. Batte, 34 Tex. Civ. App. 456, 79 S. W. 629.

But in Supreme Lodge of K. of P. v. Neely, 135 S. W. 1046, the Court of Civil Appeals of the Third district, in an elaborate and exhaustive opinion by Associate Justice Jenkins, held that the proper measure of damages in such a case is the value of the policy at the time of the breach, and cites and discusses many cases presenting both views. We are not prepared to dissent from the views expressed by Judge Jenkins in the Neely Case in so far as the rule governing the measure of damages is applied to the facts of that case. But should that rule obtain in a case like the present, where the evidence justifies the conclusion that at the time of the breach the physical condition of the insured had become so impaired that he could not get other insurance in desirable and solvent companies? We think not. In the Neely Case there is nothing to suggest that the insured could not obtain a policy in other insurance organizations at the time of the breach of his contract, but rather the reverse appears. Here the allegation and proof was such that the court will be presumed to have found that the insured at the time of the breach, and since then, was unable, by reason of his impaired physical condition, to procure other insurance. So the question presented for decision in the Neely Case is not the question 'that we must decide. We believe that in a case such as is presented by this record, where the insured, while in good health, has contracted with an insurance company, and has for 9½ years regularly paid the premiums and performed his part of the contract, and after he had reached a condition in which he is no longer able to procure insurance elsewhere, the insurance company breaks its contract, the logical measure of damages would at least require the restoration of the benefits received by the insurance company. By the breach of the contract under such circumstances' the insured is in worse condition than if he had never held the policy. He not only loses the assurance which he thought he had from the insurance company that the amount of his policy would be paid upon his death, but he has been lulled into a sense of security, his activity in procuring other insurance at a time when he was an insurable risk has been stifled, and he awakes when too late to avoid it to find that he has no insurance in the company in which he placed his trust and cannot procure insurance elsewhere. It is quite apparent that the measure of recovery laid down in the Neely Case would not have been applied had the facts been the same as in this case, for Judge Jenkins in the opinion of the court says: "In such cases the amount of damages would be a fact to be determined by the jury, not arbitrarily, but upon the opinion of experts, as applied to the well-known principles of life insurance."

[13] That question not being before the court for its decision, however, the rule suggested is obiter dictum and not binding on us. We think that as a proposition of law it is not sound, and this becomes at once apparent when we reflect on the impossibility of any physician, however expert he may be, to tell how long a man in impaired health will live.

In Ebert v. Mutual Reserve Fund Life Association, 81 Minn. 116, 83 N. W. 506, 834, 84 N. W. 457, the court touches upon the rule in cases such as this and disposes of it in this wise: "But if his health has become impaired, and new insurance could not have

been procured, then the measure of damages would seem to be the present value of such policy as of the date of death, according to the mortality tables, less the estimated cost of carrying the same from the date of cancellation at his age." The unreasonableness of this measure will be apparent upon consideration of the fact that the mortality tables are not computed upon the duration of the lives of people whose health is impaired, but upon persons of average health, so that, if the duration of the life of the insured after the breach of the policy was computed upon the mortality tables, the basis of the computation would be altogether incorrect. That the court in the Ebert Case was not sure of the correctness of the rule stated is evident from the following statement made in that connection: "We shall feel at liberty to treat the question de novo if it shall be presented again." After mature consideration we conclude that the measure of damages applied by the lower court was, under the facts of this case, correct, and the assignment is overruled.

Our disposition of the thirteenth assignment disposes also of appellants' fourteenth and fifteenth assignments adversely to their contention.

[14] Appellants' sixteenth assignment complains that the court erred in holding the Pittsburg Life & Trust Company liable to plaintiff and in rendering judgment against it. This assignment points out no error. The testimony justified the conclusion of the trial court that the Pittsburg Company had taken over practically all of the assets of the Washington Life, had assumed complete control of its properties, and had in effect absorbed the latter company, had assumed to exercise acts of ownership of the policy contract of Lovejoy, and that all this was done in pursuance of the contract between the two companies of December 30, 1908, wherein the Pittsburg Company assumed all liabilities of the Washington Life. 10 Cyc. 306, 307, 309. The assignment is overruled.

[15] The seventeenth assignment complains that, as the children of Lovejoy were the beneficiaries in the policy, the appellants, if liable at all, were liable to them, and that the court erred in rendering judgment wholly in favor of appellee, John Lovejoy. In overruling this assignment we need say no more than that the judgment rendered in this case fully protects the appellants against any claim the beneficiaries had against the companies, or either of them. If the judgment was erroneous in the respect mentioned, such error can only be asserted by the beneficiaries, and they do not complain.

We find no errors in the record requiring a reversal of the judgment of the court below, and the judgment is affirmed.

Affirmed.