PROVIDENT SAVINGS LIFE ASSUR. SOCIETY OF NEW YORK et al. v. ELLINGER.

(Court of Civil Appeals of Texas. Austin. June 25, 1913. Rehearing Denied Oct. 8, 1913. Writ of Error Denied by Supreme Court March 4, 1914.)

1. INSURANCE (§ 47*) — CONSOLIDATION — RIGHTS OF POLICY HOLDERS—LIABILITY OF NEW COMPANY.

Where, on defendant's insurance business being taken over by the P. Company, the latter offered to assume plaintiff's policy, but he refused to consent to the novation, the P. Company was under no contractual relations with plaintiff, and hence he could not recover against it for defendant's alleged breach of contract resulting from the consolidation.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 49; Dec. Dig. § 47.*]

2. INSURANCE (§ 47*) — CONSOLIDATION — BREACH OF CONTRACT—LIABILITY OF NEW COMPANY.

Where the consolidation of defendant insurance company with the P. Company did not deprive defendant of ability to perform its contracts or render it insolvent, but on the date when plaintiff chose to treat his policy as having been repudiated by defendant, by reason of the consolidation, defendant was amply able to fulfill the same, the P. Company was not liable in damages to plaintiff on the ground that it had absorbed all defendant's assets.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. § 49; Dec. Dig. § 47.*]

3. CONTRACTS (§ 312*)—BREACH—MODE.

A contract can be breached in only one of three ways, viz.: By failure to perform, by present positive declaration of an intention not to perform and acceptance of such declaration by the other party as a repudiation of the contract before performance is again entered upon, and by inability to perform.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279½; Dec. Dig. § 312.*]

4. INSURANCE (§ 247*)—CONTRACT—BREACH.

Where an insurance policy obligated the insurer to pay $3,000 to insured's wife at his death, there could be no breach by the insurer by failure to perform prior to the insured's death.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 534–536; Dec. Dig. § 247.*]

5. CONTRACTS (§ 313*)—ANTICIPATORY BREACH —REFUSAL TO PERFORM—DECLARATION.

Where an anticipatory breach of contract is attempted to be shown by the declaration of the party that he will not perform the same, such declaration must be in positive and unconditional terms.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1279: Dec. Dig. § 313.*]

6. INSURANCE (§ 237*)—CONTRACT—BREACH— REFUSAL TO PERFORM.

Defendant insurance company, on consolidating with the P. Company, notified its policy holders of the fact, and the P. Company requested they accept it in lieu of defendant, but the letters did not contain any positive declaration that defendant would not continue to perform its contracts with holders refusing to accept the P. Company in lieu of it, nor did defendant surrender its corporate existence or go out of business as to contracts theretofore written. Policy holders were informed that branch offices of defendant would gradually be discontinued and premiums should be forwarded direct to defendant's New York office, but until further advised they might be remitted as at present. Held, that such facts did not show that defendant had breached its insurance contract with plaintiff by refusing to perform the same so as to entitle plaintiff to recover damages therefor.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

7. INSURANCE (§ 237*)—CONTRACTS—BREACH— CONSOLIDATION.

Where, notwithstanding consolidation of defendant insurance company with the P. Company, defendant's affairs had never been liquidated, and in addition to its capital stock of $100,000 it had on deposit with the New York Superintendent of Insurance $100,000 in bonds, loans, and mortgages valued at $101,710, and its report filed with the Commissioner of Insurance December 31, 1912, showed a surplus of $255,409 over all liabilities, including capital stock, it did not appear that by such consolidation it had breached its policy with plaintiff by pauperizing itself so that it was unable to perform the same.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

8. INSURANCE (§ 237*)—POLICY—BREACH OF CONTRACT—MEASURE OF DAMAGES.

In an action for an insurance company's breach of an ordinary life policy, plaintiff's measure of damages was the value of the policy at the time of its breach, consisting of the difference between what it would have cost him to

mature the policy from the time of such breach to end of his expectancy, had there been no breach, and what it would have cost him to mature a like policy in a solvent company for the same period, and not the amount of premiums paid, with interest.

[Ed. Note.—For other cases, see Insurance, Cent. Dig. §§ 513–515; Dec. Dig. § 237.*]

Appeal from District Court, Fayette County; Frank S. Roberts, Judge.

Action by Joseph Ellinger against the Provident Savings Life Assurance Society of New York and others. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

Baker, Botts, Parker & Garwood and J. C. Townes, Jr., all of Houston, for appellants. John T. Duncan, of La Grange, for appellee.

### Findings of Fact.

JENKINS, J. On July 11, 1891, the Provident Savings Life Assurance Society of New York, hereinafter referred to as the Provident Company, issued to appellee an "annual renewable term policy" for $3,000, payable at his death to his wife. This policy by its terms was to remain in force for one year from the date of its issuance in consideration of the premium then paid, but was renewable from year to year at the option of the insured, without medical examination, upon the payment of certain stipulated annual premiums, which were to be increased each year from $50.76, the amount of the first premium at appellee's then age of 39, to $124.50, at the age of 60 years. It was provided that a failure to pay the renewal premium, designated in said policy, for each succeeding year, on or before July 1st, should work a forfeiture of said policy. Appellee paid such premiums to and including July 1, 1910, which kept his policy in force to July 1, 1911. Thereafter he declined to pay any further premium for the alleged reason that the Provident Company had repudiated its contract with him by reason of its transactions with the Postal Life Insurance Company of New York, hereinafter referred to as the Postal Company, as hereinafter set out. Said transactions were in substance as follows: Appellee received a printed letter from the president of the Provident Company, dated January 19, 1911, stating that said company had been consolidated with the Postal Company, to which it had transfered all of its "admitted assets," and that the latter company would carry out the contracts of the former. He received a letter from the president of the Postal Company of same date to like effect, and also a contract for him to sign, accepting the Postal Company as his insurer in lieu of the Provident. This he declined to sign. On June 15, 1911, he received a notice from the Postal Company, notifying him to pay his next renewal premium to that company. He never received any communication of any character from the Provident Company subsequent to receiving said circular letter of January 19, 1911. On July 24, 1911, appellee's attorney wrote to the Provident Company that he had elected to treat its actions as a repudiation of its contract, and demanded a return of all premiums paid by him, with 6 per cent. interest thereon from the respective dates of such payments. The Provident Company did not reply to this letter. On November 2, 1911, appellee instituted this suit, alleging as his cause of action against the Provident Company its repudiation of its contract, and as against the Postal Company its assumption of said contract and its absorption of all the funds of the Provident Company. He recovered judgment against each of said companies for $2,215.55. If appellee had shown himself entitled to recover the full amount of the premiums paid by him, the judgment should have been for only $1,895.12, as the undisputed evidence shows that the aggregate amount of premiums paid by him was $1,160.52, and the interest thereon would amount to $734.60.

### Opinion.

[1] 1. We sustain appellant's assignment that no judgment should have been rendered against the Postal Company. No contractual relation ever existed between it and appellee. It offered to enter into a contract with him by assuming the obligations in the policy issued by the Provident. This the appellee specifically declined. Lovell v. Ins. Co., 111 U. S. 264, 4 Sup. Ct. 390, 28 L. Ed. 426.

[2] 2. Appellee, if entitled to recover against the Provident Company, would have been entitled to judgment against the Postal also, if it had been shown that the latter had absorbed the funds of the former company, and thereby rendered it unable to perform its contract with appellee. The evidence does not sustain this allegation. S. H. Wolf, who appears to have been a competent and disinterested expert in insurance matters, testified that he had examined the books of the Provident Company; that he considered it a solvent corporation, and that it was such on July 11, 1911; that the capital stock of said company was $100,000; that its affairs had never been liquidated; that it had on deposit with the Superintendent of Insurance of New York $100,000, consisting of bonds, loans, and mortgages, of the value of $101,710, and that its report filed with said Commissioner of Insurance as of December 31, 1911, showed a surplus of $255,409 over all liabilities, including capital stock. This does not show the Provident Company had become pauperized by reason of its transactions with the Postal Company on December 31, 1910, the date of the alleged consolidation, but, on the con-

trary, that it was solvent and abundantly able to carry out its contract with appellee, when he chose to treat his contract as having been repudiated, and so remained at least until December 31st thereafter, and, for aught that appears, still is. There is no evidence in the record tending to contradict this testimony.

[3] 3. Appellants contend, under proper assignments of error, that no judgment should have been rendered against the Provident Company for the reason that the evidence fails to show any breach of the contract on the part of that company. We sustain this assignment of error. A contract can be breached in only one of three ways, viz.: (1) By a failure to perform; (2) a present positive declaration of an intention not to perform, and acceptance of such declaration by the other party as a repudiation of the contract before performance is again entered upon; and (3) inability to perform. 7 Am. & Eng. Ency. Law, 149.

[4] 4. In this case there could have been no failure to perform the contract on the part of the Provident Company, for the reason that the time of performance, to wit, the death of the insured, had not arrived.

[5] 5. Where an anticipatory breach of a contract is attempted to be shown by the declaration of the party that he will not perform the same, such declaration must be in positive and unconditional terms. Kilgore v. Association, 90 Tex. 142, 37 S. W. 598; Starke v. Guffey, 98 Tex. 542, 86 S. W. 1, 4 Ann. Cas. 1057; Lovell v. Ins. Co., supra; Jameson v. Ins. Co., 14 App. Div. 380, 44 N. Y. Supp. 15.

[6] The facts in brief, with reference to this transaction, are set forth in our findings of fact herein. The circular letters referred to did not contain a positive declaration that the Provident Company would not continue to perform its contract with appellee if he refused to accept the Postal Company in lieu of it; nor that the Provident had surrendered its corporate existence or gone out of business as to its insurance contracts theretofore written. On the contrary, the circular from the Postal Company contained, among other things, the following: "The branch offices of the Provident will gradually be discontinued, and premiums be forwarded by the policy holder himself direct to the New York office, at 35 Nassau street. Until further advised, premiums will be remitted as at present." Under this statement, the appellee should have remitted his premium on or before July 1, 1911, to the Provident Company, at 35 Nassau street, where such company had long maintained its office. The policy provided that payment of premiums should be made at the company's office in New York, but, for convenience of its policy holders, payments might be made to an authorized agent of the company, "but only in exchange for a receipt signed by the president and secretary and countersigned by said agent." The appellee testified: "As far as I know, the Provident Savings Life Assurance Society of New York has ceased to do business in this state." If this be taken as proof that the Provident Company had ceased to do business in Texas on July 1, 1911, still, under the above provision of the policy, it was the duty of appellee to forward his premiums to the company's office in New York. There is no evidence that, had he done so, his money would not have been received by the Provident Company, and his policy continued in force by that company. On the contrary, the witness Wolfe testified that the Provident Company was accepting premiums and continuing in force contracts with policy holders, who preferred not to accept the Postal Company as their insurer.

[7] 6. The appellee was not entitled to recover against the Provident Company on the ground that that company had breached the contract by pauperizing itself and thereby becoming incapable of performing the contract. It had not done so, as appears from the second paragraph of this opinion. In the case of Ins. Co. v. Lovejoy, 149 S. W. 398, cited by appellee, the company had transferred all of its assets, about $20,000,000, except $25,000, thereby rendering itself incapable of performing its contracts.

[8] 7. We sustain appellants' assignment of error that even had the Provident Company breached its contract with appellee, and had the Postal Company rendered itself liable for the damages incurred by reason of such breach, the amount of the premiums paid by appellee, with interest thereon, was not the measure of appellee's damages.

The only case directly upon this point in this state is Supreme Lodge K. of P. v. Neeley, by this court, 135 S. W. 1046. In that case we held, after a thorough and careful investigation of the authorities, that the proper measure of damages for the breach of a life insurance contract, where the insured is insurable at the time of such breach, is the value of said policy at the time of such breach, and that such present value is the difference between what it would have cost him to mature said policy from the time of such breach to end of his expectancy, had there been no breach, and what it would cost him to mature a like policy in a solvent company for the same period. We have had no occasion to change our views on this subject. In addition to the authorities cited in the Neeley Case, supra, in support of our holding therein, see Harris v. Scrivener, 78 S. W. 705; Supreme Lodge K. of P. v. Neeley, 135 S. W. 1046; Life Ass'n v. Ferrenbach, 144 Fed. 342, 75 C. C. A. 304, 7 L. R. A. (N. S.) 1163; Krebs v. Ins. Co. (C. C.) 156 Fed. 294; People v. Ins. Co., 78 N. Y. 114, 34 Am. Rep. 529; Skudera v. Ins. Co., 17 Misc. Rep. 367, 39 N. Y. Supp. 1059; Williams v. Metropolitan Life Ins. Co., 35 App. Div. 82, 54 N. Y. Supp. 595; Keyser v. Life Ass'n, 60 App. Div. 297, 70 N. Y. Supp. 32; Langan v. A.

L. of H., 34 Misc. Rep. 629, 70 N. Y. Supp. 663; Kelly v. Ins. Co., 106 App. Div. 352, 94 N. Y. Supp. 601; Mailhoit v. Ins. Co., 87 Me. 374, 32 Atl. 989, 47 Am. St. Rep. 336; Ins. Co. v. Binford, 76 Va. 103; Clemmitt v. Ins. Co., 76 Va. 355; Ins. Co. v. Houser, 89 Ind. 258; Merrick v. Ins. Co., 124 Wis. 221, 102 N. W. 593, 109 Am. St. Rep. 931; May on Ins. § 567; Bliss on Ins. § 415; Cooke on Life Ins. § 104; Cyc. 25, 761, 762.

Appellee cites, in support of his contention that the premiums paid, with interest thereon, is the proper measure of damages: A. L. of H. v. Batte, 34 Tex. Civ. App. 456, 79 S. W. 629; Ericson v. S. R. of Mystic Circle, 105 Tex. 170, 146 S. W. 160; and Ins. Co. v. Lovejoy, 149 S. W. 398. None of these cases sustain his contention. For a full discussion of the Batte case, see Neeley's Case, supra.

The issue as to the measure of damages was not raised in the Ericson Case, and was not referred to by this court (131 S. W. 92), nor by the Supreme Court (105 Tex. 170, 146 S. W. 160). The facts in the Ericson Case were that Ericson joined a local lodge of a fraternal insurance company, chartered under the laws of Ohio under the name of the Fraternal Mystic Circle. Its ruling body or board of directors was known as the Supreme Ruling of the Fraternal Mystic Circle. In April, 1895, some years after the Mystic Circle was chartered in Ohio, a fraternal organization was chartered in Pennsylvania under the name of the Supreme Ruling of the Fraternal Mystic Circle. Some of the members of the Ohio corporation were members of the Pennsylvania corporation. On June 5, 1895, the Fraternal Mystic Circle of Ohio passed a resolution transferring all of its assets and insurance contracts to the Pennsylvania corporation, to be effective when accepted by the latter corporation. Thereafter the Pennsylvania corporation accepted said transfer, and said action was ratified by Ericson, who thereafter paid his assessments for a number of years to the Pennsylvania society. In 1907 the Pennsylvania society adopted a constitution authorizing the Supreme Executive Committee of said society "to re-rate members taken over from another society." Thereafter the Supreme Executive Committee re-rated Ericson, materially raising his assessments. This it was not authorized to do, unless Ericson was "a member taken over from another society." We held that the Fraternal Mystic Circle, chartered under the laws of Ohio, and the Supreme Ruling of the Fraternal Mystic Circle, chartered under the laws of Pennsylvania, were different societies, and that consequently Ericson was "a member taken over from another society." The Supreme Court held that he was not, and consequently there was no authority to re-rate him. There was a further issue in the case as to whether said constitutional provision was applicable to members who had theretofore been taken over from other societies, or only as to those who might thereafter be taken over. We held that it applied to members theretofore taken over; the Supreme Court that it did not. Such being the holding of the Supreme Court, it followed that the increase in Ericson's rate was without lawful authority. The Supreme Court held that such re-rating amounted to a repudiation of the contract; no other issues were presented in that case in either this or in the Supreme Court.

In the Lovejoy Case Mr. Justice McMeans, speaking for the court, said: "We are not prepared to dissent from the views expressed by Judge Jenkins in the Neeley Case, in so far as the rule governing the measure of damages is applied to the facts of that case." The fact referred to, which differentiated the Neeley Case from the Lovejoy Case, was that Neeley was reinsurable at the time the contract was breached and Lovejoy was not.

There is no evidence in this case tending to show that appellee was not insurable at the time of the alleged breach of the contract. On the contrary, the evidence establishes the fact that the Postal Company was a perfectly solvent company, and that it offered to carry the same policy that appellee held upon the same terms, without medical examination. Such being the case, appellee could have suffered no damage by the alleged breach of his contract with the Provident Company, even had such breach been shown.

Two disinterested and competent experts testified that appellee's policy had no cash value at the time of the alleged breach thereof, and no witness testified to the contrary. That this must necessarily have been true, if appellee had received the proper rebates on his several premiums, is apparent to any one who has any knowledge of the basis upon which an "annual renewable term policy" is issued. Such policies are based on the theory that the premium charged is just enough to pay the running expenses of the company, the death claims for the year, and a small excess, called "the guaranty fund," to provide for any excess in the average number of deaths that may possibly occur during the year. This excess is not carried as a reserve, as is the case with level premium policies, but, if not consumed in death losses during the year, is prorated and paid back to the insured, usually by allowing the same as a credit on the next year's premium. This is made plain by the express provisions of the policy herein sued on, from which we quote as follows: "After deducting the expense charge, which is limited to four dollars per annum on each thousand dollars insured, the society agrees to divide the residue of each renewal premium received by it upon *this policy* as follows: Such amount as shall be required for *this policy's share* of death losses will be appropriated as a death fund, to be used only in settlement of death claims, the remainder thereof will be retained as a guaranty fund. The amounts so retained on account of this

policy will be used toward offsetting any increase in the premium on this policy from year to year."¹ The evidence shows that such excess was allowed the appellee from year to year, and that the aggregate of the premiums paid by him in cash was $1,160.52. Of this $252 was appropriated to the expense fund. The evidence shows that the amount "required for this policy's share of death losses" and actually paid out by the society as provided in the policy was $882.66, leaving a balance in the guaranty fund from premiums paid by appellee of $25.86, which is the amount he would have been entitled to have recovered, had the Provident Company breached the contract.

In saying that an annual renewable term policy, such as the one herein sued on, could never have a cash surrender value at the end of any year, beyond the small amount, if any, of his last annual premium not consumed by the expense account and death claims, we do not mean to say that such policies are not valuable for the purpose for which they are issued, viz., protection, which is the leading purpose of all life insurance. For such purpose they are the most equitable of all policies, as they enable the insured to obtain insurance for each current year at actual cost. In consequence of this, insurance under such a policy is obtained very cheaply during the early years of one's life, when protection to a growing family, or provision to meet debts incurred in establishing a business, is usually most needed, and in later years, when the premium becomes burdensome, the insured can, if he chooses, let the policy lapse.

The appellee got all he paid for, and the protection he received under his policy was worth all that it cost him, less the $25.86 remaining in the guaranty fund.

For the reasons here stated, the judgment of the trial court is reversed, and judgment here rendered for appellants.

Reversed and rendered.