WELCH VETERINARY SUPPLY COM-
PANY et al., Appellants,

v.

John MARTIN, Appellee.

No. 3526.

Court of Civil Appeals of Texas.

Waco.

April 3, 1958.

Rehearing Denied May 15, 1958.

Naman, Howell & Smith, J. Rodney Lee, Waco, for appellants.

Bradley & Geren, Groesbeck, for appellee.

TIREY, Justice.

This is a damage suit grounded on a warranty growing out of a telephone conversation. At the conclusion of the testimony the court overruled defendants' motion for an instructed verdict. The jury, in its verdict, found substantially that plaintiff's hogs died as a result of cholera and from no other disease, and that their death was not caused by the feeding of raw garbage, and further that the feeding of raw garbage did not contribute to the death of the hogs; that defendant Evans did not state to plaintiff that True-Vac would immunize his hogs against cholera if they were fed garbage; that plaintiff Martin was not justified in relying upon the statement made by Evans in using True-Vac vaccine; that Welch stated to plaintiff that True-Vac would immunize his hogs against cholera if they were being fed garbage, and that such statement was not an expression of an opinion, and that Martin did not know that such statement was an expression of an opinion, and that Martin should not have known that such statement by Welch was an expression of an opinion, and that plaintiff relied upon the statement to him by Welch, and that Martin was justified in relying upon such statement; that 200 hogs died of cholera and that their average weight was 150 pounds, and that their value was 16¢ per pound, and that Martin did not fail to mitigate his damages. Defendants seasonably filed their motion for judgment non obstante veredicto, which was overruled, and the court granted

plaintiff's motion for judgment, and the judgment followed the verdict. Defendants seasonably filed their motion for new trial, which was overruled, and they have perfected their appeal to this court. (Evans, a local druggist, was also made a party defendant and on the verdict of the jury judgment was entered that plaintiff take nothing against him, and there is no assignment of error on the court's action).

The judgment is assailed on four points. They are substantially that the court erred (1) in overruling their motion for an instructed verdict because there is no evidence that the appellants made any statement to appellee concerning the product True-Vac, other than a mere expression of opinion, belief or judgment; (2) in overruling defendants' motion for judgment notwithstanding the verdict of the jury, because there was no evidence to support the finding of the jury to Issue No. 5, to the effect that Welch stated to appellee that True-Vac would immunize his hogs against cholera, if they were being fed garbage; (3) in overruling defendants' motion for an instructed verdict because the plaintiff was, as a matter of law, placed on notice that defendants were not warranting the True-Vac vaccine in question when the plaintiff read the printed disclaimer with the instructions enclosed with each package of True-Vac vaccine sold to him by Edwin Evans; (4) in overruling the objection of defendants to the argument of attorney for appellee to the jury to the effect that appellee is a poor hog raiser while Anchor Serum Company and Welch Veterinary Supply Company paid the expenses of witness from St. Joseph, Missouri, and Anchor Serum Company is the largest corporation of its kind in the world, because such argument is immaterial, highly prejudicial and constitutes an argument of the poverty of the appellee and the richness of the appellants.

A statement is necessary. Appellee went to trial on his Second Amended Original Petition. Pertinent to this discussion, we quote substantially paragraph 2: that plaintiff is in the business of farming and raising hogs for market; that during the month of February, 1956, plaintiff was feeding a large number of hogs and was in need of serum and virus to vaccinate said hogs against cholera; that the plaintiff approached Edwin Evans, a druggist at Groesbeck, Texas and discussed the matter of a proper vaccine for said hogs, to which he was going to feed garbage; that Evans advised plaintiff that there was a True-Vac product being sold by the Welch Veterinary Supply Company at Ft. Worth, which was highly recommended, and Evans suggested that he would call the supply company so that the company could explain the quality of its product; that in accordance with such suggestion, Evans did call the supply company and had plaintiff talk to C. M. Welch, who recommended that plaintiff use the product known as True-Vac, which is a modified virus, and which Welch stated would immunize said hogs from cholera, and which Welch and Evans warranted to be fit for the use of plaintiff, and better than the live virus plaintiff intended to use; that Welch advised plaintiff to give the hogs 2 cubic centimeters of True-Vac per hog and 25 or 30 cubic centimeters or more of hog cholera serum, according to the weight of the hog; that plaintiff purchased from Evans, at the recommendation of Evans and Welch, the True-Vac furnished by Welch Veterinary Supply Company, and vaccinated said hogs according to the instructions given to plaintiff by Welch and Evans; that at the time plaintiff vaccinated said hogs, they were not sick and had no cholera, and after said hogs were vaccinated, they began getting sick, and some of them began to die, and by the month of July quite a few of them were dying, and they continued to die in August, September and October, 1956; that plaintiff contacted Evans, who called Welch Veterinary Supply Company, and advised them that the hogs were dying; that Welch Veterinary Supply Company then

sent a veterinarian to examine said hogs, and advised plaintiff to sell immediately the hogs which were living; that the veterinarian sent by Welch Veterinary Company called in another veterinarian, who had diagnosed the ailment of the hogs as being cholera, and who advised plaintiff to vaccinate the hogs for cholera. Plaintiff then vaccinated the hogs remaining for cholera with another serum and a live serum other than True-Vac, and plaintiff lost no other hogs; that the True-Vac vaccine furnished by defendants to plaintiff was the direct cause of the death of the hogs.

Appellants went to trial on their First Amended Original Answer. Pertinent to this discussion, appellants entered a general denial, and further plead that they were engaged in the wholesale drug business in Ft. Worth, under the name of Welch Veterinary Supply Company, during which time they have purchased True-Vac vaccine, which is a reasonably useful product for the immunization of garbage-fed hogs against hog cholera from the Anchor Serum Company; that this vaccine was manufactured and produced under government regulation; that they had nothing to do with the manufacture or preparation of this product; that they sold a portion of this vaccine, in its original package, to Evans, a retail druggist at Groesbeck, during the year 1956, and that prior to the sale, Evans called C. M. Welch on the telephone; that after Evans got C. M. Welch on the telephone, he asked him to speak with plaintiff Martin, which he did; that in response to a question presented by plaintiff Martin, C. M. Welch stated that he could see no reason why True-Vac vaccine, which is a modified live virus, would not be just as effective in immunizing garbage-fed hogs from hog cholera as a live virus, and that it might be preferable to a live virus, in that a modified live virus does not spread the hog cholera germ, while a live virus does; that C. M. Welch did not, in the course of this conversation, state that True-Vac

vaccine would immunize John Martin's garbage-fed hogs, and did not expressly or impliedly warrant True-Vac vaccine, and enters an express denial; that the statement made to C. M. Welch during his telephone conversation with plaintiff Martin was a mere statement of opinion, belief or judgment, and was recognized as such by plaintiff Martin.

Because of the fact that plaintiff Martin went to druggist Evans in Groesbeck to discuss with Evans the matter of serum and virus for his hogs, we quote the pertinent part of plaintiff Martin's testimony:

"Q. What did you tell Mr. Evans in regard to that? A. I told him I was buying a garbage route down close to Houston and I had been advised not to use the modified virus, told to use the old hot virus and serum, the old-timey remedy.

"Q. What did Mr. Evans tell you? A. He said, 'Well, I don't know about it,' said, 'I believe it will be all right' and I said, 'Well, I don't know myself, just what they told me.' He said, 'I tell you what we will do,' said, 'we will call Mr. Welch and talk to him about it.' So he called Mr. Welch and explained to Mr. Welch over the telephone and he said, 'well, I want you to explain it to Mr. Martin.' and so, Edwin said, 'you take this phone and I will get this one back here.' * * *

"Q. What was your conversation with Mr. Welch? A. Well, I told Mr. Welch what I was fixing to do and these fellows had advised me on it.

"Q. Now, what did you say you were fixing to do, did you tell Mr. Welch what you were going to feed your hogs? A. Yes, sir, I told him I had bought a garbage route down at Houston and the feeders down there had told me not to use modified virus, to use the old timey remedy, the hot virus and serum. * * *

"*A. And I asked Mr. Welch what he thought about it, and he said well, if I would use it like he told me to he didn't believe I would have any trouble. And I said, 'Well, what would be your suggestion on it, and he said, 'Well, you give 2 ccs of True-Vac and 25 or 30 ccs of serum, and I don't think you will ever be bothered with any cholera.'*

"Q. After you discussed it with him, was that the extent of your conversation with Mr. Welch? A. Yes, sir.

"Q. And then when you hung up did you talk to Mr. Evans? A. Yeah, we talked about it.

"Q. Do you remember what Mr. Evans said in regards to that? A. *He said, 'well, his honest opinion he believed it would be all right.'*

"Q. I will ask you to state whether or not you then bought the modified virus and serum from Mr. Evans? A. I don't know whether I bought any that day or not but I bought lots of it from him after that."

We quote the pertinent part of the testimony of C. M. Welch relating to his telephone conversation with plaintiff:

"Do you remember having a discussion with him, with Mr. Evans and did Mr. Evans tell you at that time that Mr. John Martin intended to feed garbage to his hogs and wanted to know about using a modified virus as an immunization against hog cholera? A. Well, in substance of that, yes, sir.

"Q. And after Mr. Evans had told you that Mr. Martin was going to feed garbage to his hogs, did you then talk to Mr. Martin? A. Mr. Evans said, 'well, I will let you talk to Mr. Martin.' And Mr. Martin came on the phone.

"Q. Now, then, did you and Mr. Martin have a discussion about the use of the modified live virus with serum as protection and immunization of his hogs against cholera? A. I don't know whether you would call it a discussion or what you would call it, I just made a statement to Mr. Martin regarding the product.

"Q. Now, do you recall Mr. Evans telling you that Mr. Martin wanted to use the old-time live virus and serum rather than the modified virus? A. No, sir.

"Q. You don't recall that? A. No, sir.

"Q. Well did Mr. Martin discuss with you about using the live virus. A. No, sir.

"Q. Well, didn't he tell you that he was going to feed garbage to those hogs and that he had been informed by those hog feeders down there around Houston if he fed garbage to them the modified—if he fed garbage to them that a modified virus would not immunize them against cholera? A. Nothing was said at that time, about—no statement like that. * * *

"Q. He did state that he was going to feed them. I believe he told you in the conversation that he was going to feed them down at Magnolia, Texas? * * * A. Here's what he said. He said he was going to feed hogs and they wanted to talk to me about using the modified virus instead of the virulent virus, the old-time hot virus.

"Q. And in that conversation didn't he tell you that he had opened a garbage feeding place down near Magnolia, Texas? A. I understood that he was to feed garbage, yes, sir. And nothing was said about what kind of garbage. And it didn't occur to me to go into that. * * *

"Q. What did you tell Mr. Martin in regard to the use of True-Vac?

A. *I made the statement that I didn't know of any reason why the modified live virus, there are several brands of it, but the one in question we were talking about was True-Vac, that is just the trade name. I said that I knew of no reason why the modified live virus known as True-Vac would not be as effective in immunizing his hogs against cholera as the virulent virus, and because of the fact that the modified live virus does not spread the cholera from one hog to another, it does not contaminate the premises and does not require the careful handling and feeding of the hogs following the vaccination as in the case of the live virus, that it might be preferable. I made no recommendation.*

"Q. But you said it might be preferable? A. It might be preferable in view of those things.

"Q. To the live virus? A. In view of those facts it might be preferable.

"Q. Did you discuss with Mr. Martin about the dose of True-Vac to be given and the corresponding amount of anti-hog cholera serum to be used with the True-Vac? A. *I did remind Mr. Martin that in all instances, of course, as he knew, that the producing company recommended a minimum dose of anti-hog cholera serum of 2 ccs but in vaccinating hogs that comes from sales rings, stock yards or being fed garbage, the dosage should be increased to the regular therapeutic dose as if using the live virus. Mr. Martin wanted to know how much, and I asked him how much his hogs weighed. I think he said they weighed around 90 or 100 pounds, probably average 90 pounds. Well, I said, I suppose you could use a minimum of 30 ccs or a little more, 30 to 40 ccs.*

"Q. And you advised him under the circumstances he had related that 30 to 40 ccs on a 90 to 100 pound hog of anti-hog cholera serum would be the correct amount? A. No. I said that hogs passing through sales rings stock yards, or being fed garbage should be given the regular therapeutic dose of anti-hog cholera serum. And Mr. Martin said how much is it and I said, 'how much do your hogs weigh,' 'well, I will say they average around 90 pounds,' and I said, 'well, they should be given a minimum of 30 ccs, 30 to 40 ccs.'

"Q. And that was based on garbage fed hogs and hogs from stock yards and rings and places like that? A. Based on the weight of the hogs, anti-hog cholera serum is always based on the weight of the hogs.

"Q. On the weight of the hogs and those conditions? A. Yes.

"Q. And under those conditions you recommended that a 90 to 100 pound hog 30 to 40 ccs? A. I said that would take from 30 to 40 ccs of serum.

"Q. Now, in addition to that how much True-Vac did you recommend? A. The dosage of that is always 2 ccs.

"Q. It doesn't make any difference as to the weight or the conditions? A. That is the recommendation of the Producing Company and we can only follow that.

"Q. You recommended that he use the dosage that was just related here in regard to the hogs? A. I just remined him of those recommendations or suggestions of the Producing Company.

"Q. And you did tell him you thought that the True-Vac would be preferable to the live virus? A. No, sir. I said in view of the fact these things would not do as the live virus would do, it might be preferable."

We quote the pertinent part of Evans' testimony:

"Q. And on this particular occasion Mr. John Martin, I believe, came into your drug store in the early part of 1956 and discussed with you about purchasing some hog cholera serum and vaccine? A. Yes, sir.

"Q. Do you remember that occasion? Wasn't it along about January of 1956? A. I don't recall the date. He was going out and buy a bunch of hogs, he had gone out to buy a bunch of hogs one week end, and said, 'I wish you would get me some serum where I will have it on hand when I buy my hogs.'·

"Q. Now, did he discuss with you and tell you that he wanted you to order for him some live virus and serum? A. No, sir.

"Q. He did not? A. No, sir.

"Q. It is your testimony that Mr. Martin didn't come in there and tell you that he had these hogs down there and he wanted to see about getting some live virus and serum to vaccinate them? A. No, we had always bought the kind he wanted.

"Q. Well, in the past when he was not feeding garbage from restaurants and hotels to his hogs, had you bought him modified virus? A. Yes.

"Q. Do you remember when he came in there on that occasion whether or not he told you that he had been informed that modified virus would not vaccinate hogs against cholera if they were being fed garbage? A. Yes, sir. * * *

"Q. And state whether or not you then told him that you thought the modified virus would satisfactorily immunize them? A. I did not tell him I thought it would.

"Q. What did you tell him? A. I told him I didn't know. * * *

"Q. You didn't recommend to him that he buy the modified virus? A. No, sir.

"Q. Did you tell him that you would call up to Fort Worth to Mr. C. M. Welch or Mr. Robert Welch of the Welch Veterinary Supply Company and discuss the matter with them. A. I let him discuss it with him.

"Q. Did you call Mr. C. M. Welch on the telephone at that time? A. At one time I did, before he started garbage feeding.

"Q. And did you tell Mr. C. M. Welch that you had Mr. Martin there and that Mr. Martin wanted to know about the use of modified virus in immunizing hogs against cholera where they were fed garbage? A. Yes, sir.

"Q. And after that did Mr. Martin talk to Mr. Welch? A. Mr. Martin talked to Mr. Welch.

"Q. All right. Now, when Mr. Martin finished his conversation with Mr. Welch did you ask Mr. Martin if Mr. Welch didn't say that modified virus would be satisfactory? A. I don't recall. Mr. Martin comes in many times and then he will leave out and I will probably be busy and he has somewhere else to go. I couldn't say that he told me at that time. He did buy some live virus. * * * I mean some modified virus. Whether it was on that particular day or not I do not know.

"Q. I will refresh your memory by asking you if Mr. Martin didn't tell you Mr. Welch said the modified virus would be satisfactory and you said, 'well, that's what I told you'? A. I don't think so.

"Q. You didn't make such statement? A. No."

Appellee further testified in part:

"Q. I will ask you to state what are the facts as to whether or not if you would have bought and used the modified vaccine if Mr. C. M. Welch hadn't told you what he told you about it? A. No, I wouldn't have used it if he hadn't recommended it.

"By Mr. Howell: We object to that on the ground that it is not responsive.

"By the Court: We will strike the word recommended and instruct the jury not to consider the word recommended used by the witness, however, the other part of the answer will be."

Testimony was tendered to the effect that an instruction sheet was enclosed with each bottle of True-Vac sold by the appellants to defendant Evans, who in turn sold the True-Vac to appellee Martin, and that this instruction sheet was read in its entirety by Martin. We quote this instruction sheet:

"Hog Cholera Vaccine Modified Live Virue, True-Vac, is produced under the rigid standards and tested under the strict supervision of the United States Bureau of Animal Industry. It is a potent product that has passed all the tests prescribed by the Bureau of Animal Industry. Because neither the producer nor the distributor has in any manner made a prevaccination examination of the pigs or hogs to be vaccinated, and has not in any way had control over the handling or administration of the vaccine, we accept no responsibility following its use.
"Distributed by
"Anchor Serum Co.
"South St. Joseph, Missouri

"Produced by
"Research Laboratories, Inc.
"U. S. Veterinary License
No. 221
"St. Joseph, Missouri."

The detailed conversation between appellants and appellee here above set out constitutes the sole and only conversation between them prior to the sale of the True-Vac. See 77 C.J.S. Sales § 310, p. 1136.

As we understand the record, it was stipulated that True-Vac was made under government regulations.

■■ Before discussing each of appellants' points, we think it is pertinent for us here to say that as a reviewing court, it is our duty to consider the evidence and the inferences properly to be drawn therefrom in the light most favorable to the party obtaining the verdict, and it is our duty in considering controverted issues of fact to accept as true that testimony which tends to support the verdict. 3-B Tex.Jur. pp. 370 and 372. Moreover, "Where the facts are controverted, or are such that different inferences may be reasonably drawn therefrom, an issue of fact is raised; it is only where the evidence is harmonious and consistent, and the circumstances permit of but one conclusion, that the question becomes one of law for the determination of the court. An issue of fact is raised 'if, discarding all adverse evidence, and giving credit to all evidence favorable to the plaintiff, and indulging every legitimate conclusion favorable to the plaintiff which might have been drawn from the facts proved, a jury might have found in favor of the plaintiff.'" (Citing cases.) See Olds v. Traylor, Tex.Civ.App., 180 S.W.2d 511, 514, points 8 and 9, writ ref. Moreover, "'It was the jury's province to weigh all of the evidence, to decide what credence should be given to the whole or to any part of the testimony of each witness. "The jury were the judges not only of the facts proved, but of the inferences to be drawn therefrom, provided such inferences were not unreasonable."'" See Burt v. Lochausen, 151 Tex. 289, 249 S.W.2d 194, at page 199, point 6. No rule is better settled than the one to the effect that if there is evidence of probative value to sustain the findings of the jury, the appellate court is bound by such findings. See Lynch v. McLendon, Tex.Civ.App., 283 S.W.2d 88, point 3 (no

writ history) and cases there collated. See ICT Ins. Co. v. Gunn, Tex.Civ.App., 294 S.W.2d 435, point 5, at page 441.

██ Going back to the testimony tendered, the jury was entitled to take into consideration all of the testimony tendered, together with all of the surrounding facts and circumstances in arriving at their verdict. There were three important witnesses whose testimony the jury had a right to consider as to whether or not appellants expressly or impliedly warranted the virus in question. Owing to the importance of the question here before us, we have set out first the testimony of the appellee and his recitation of his conversation with the local druggist, as well as his conversation with appellant Welch. We have also set out the pertinent testimony of the druggist and Welch. First of all, appellee's testimony showed that he had been alerted to the difference between live virus and modified virus, and in his conversation with Mr. Welch he asked him first of all what he thought about it, and Mr. Welch said to him, "if I would use it like he told me to he didn't believe I would have any trouble" and appellee said, "Well, what would be your suggestion on it" and Mr. Welch replied, "Well, you give 2 ccs of True-Vac and 25 or 30 ccs of serum, and I don't think you will ever be bothered with any cholera." Viewing the appellee's version of his conversation with Mr. Welch in the most favorable light, we see not even a scintilla of a warranty, express or implied. The appellee's recitation of the conversation shows that he was inquiring of Mr. Welch about his opinion and asking his suggestion on the matter. The language used by appellee is not subject to any other construction.                          .

This court, in J. R. Watkins Co. v. King, Tex.Civ.App., 83 S.W.2d 405, 407 (no writ history), made this statement of the rule which we think is pertinent here: "When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his li-

ability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is nonsuited or the court directs a verdict against him." (See points 2 and 3 and authorities there collated). See also Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 133 S.W.2d 767, 145 S.W.2d 569; La Fleaur v. Kinard, Tex.Civ.App., 161 S.W.2d 144, er. ref. w. o. m.; Leonard v. Smith, Tex.Civ.App., 186 S.W.2d 284, no writ history; Garza v. Garza, Tex.Civ.App., 191 S.W.2d 767, no writ history; City of Waco v. Thralls, Tex.Civ.App., 172 S.W.2d 142, er. ref. w. o. m. See authorities collated in point 8.

The next question that arises is, does the testimony of the druggist Evans or the testimony of appellant Welch tender an issue of express or implied warranty? As above stated, we have quoted the pertinent parts of their testimony and we find not a scintilla of evidence in either the testimony of the druggist Evans or the testimony of appellant Welch which tenders an issue of express or implied warranty. The language used by the witnesses is so clear and explicit that this discussion need not be labored. Moreover, we have quoted the instructions that were enclosed with each bottle of the virus that was sold and delivered by the druggist Evans to appellee, and appellee read these instructions in their entirety. Needless to say there is no warranty, express or implied, in these instructions, but on the contrary the manufacturer specifically said: "We accept no responsibility following its use." It is indeed regrettable that appellee suffered his loss, but we see no legal or equitable responsibility that can be placed upon appellants.

██ Applying the rule above quoted in Olds v. Traylor, supra, it is our view that the appellee's recitation of his conversation with appellant Welch to the effect that he inquired of Mr. Welch as to what he

thought about the virus and its use, and the further recitation by appellee that Mr. Welch said, "if I would use it like he told me to he didn't believe I would have any trouble," and appellee's further recitation wherein he said, "Well what would be your suggestion on it," and he quoted Mr. Welch as saying, "Well, you give 2 ccs of True-Vac and 25 or 30 ccs of serum, and I don't think you will ever be bothered with any cholera" are harmonious and consistent with Mr. Welch's testimony to the effect that appellee was inquiring about his opinion as to the virus and its use, and that he was giving the appellee his opinion of its use and the reasons why it was his opinion that the use of modified virus would be preferable to the live virus, and that appellee was not in any manner asking appellant Welch to warrant the product in any manner whatsoever. And we are of the further view that, looking at the pertinent testimony of appellee, as well as the pertinent testimony of the druggist Evans and appellant Welch and all of the surrounding circumstances, the testimony of these witnesses and all such surrounding circumstances permit of but one conclusion and that is that appellee did not request a warranty, express or implied, and that neither the druggist Evans nor appellant Welch gave him a warranty, either express or implied, and that their views on the matter were solely one of opinion.

In Jackson v. E. L. Rice & Co., Tex.Civ. App., 295 S.W. 352 (no writ history), our El Paso court made this statement of the rule: "The mere expression of an opinion as such, and not as a statement of fact, is not actionable." We are of the view that this is the exact situation here before us.

In 46 Amer.Jur., Sales, Sec. 323, p. 504, we find this statement of the rule:

"In determining whether a statement of the seller is to be deemed a warranty, it is important to consider whether in the statement the seller assumes to assert a fact of which the buyer is ignorant or merely states an opinion or judgment on a matter of which the buyer may be expected also to have an opinion and to exercise his judgment. Representations which merely express the seller's opinion, belief, judgment, or estimate do not constitute a warranty. It is well settled that to establish an express warranty it must be shown that there is an express and direct affirmation of a fact as to the quality and condition of the thing sold, as distinguished from opinion, belief, or estimate."

We think the foregoing statement is a correct one and that it is peculiarly applicable to the undisputed factual situation here.

In 37A Tex.Jur. sec. 135, p. 297, we find this statement: "The word 'representation,' as used in the law of sales, implies a material statement of fact, as distinguished from an opinion or prediction usually relating to qualities of the things sold."

Appellants also rely on and cite 4 Williston on Contracts, Sec. 971A, p. 2691; United Iron Works v. Outer Harbor Dock & Wharf Co., 168 Cal. 81, 141 P. 917; Osborne v. McCoy, 107 N.C. 726, 12 S.E. 383; United States Pipe & Foundry Co. v. City of Waco, Tex.Civ.App., 100 S.W.2d 1099 by this court, affirmed by 130 Tex. 126, 108 S.W.2d 432; Ray v. Burbank, 61 Ga. 505, 34 Am.Rep. 103; 39 A.L.R. 399, annotation, "Liability of seller of serum or vaccine matter for use on livestock for breach of warranty or negligence;" Balhorn v. Pitman Moore Co., Iowa, 200 N.W. 601; 37A Tex.Jur., Sales, Sec. 158, p. 338. Because of the views we have heretofore expressed, we see no reason to discuss the foregoing authorities.

Since we are of the view that no warranty was shown, either express or implied, the court erred in overruling appellants' motion for instructed verdict and accordingly we sustain appellants' points 1, 2 and 3. It follows that appellants' 4th point passes out of the case.

Accordingly, the judgment of the trial court awarding damages in favor of appellee against appellants is reversed and rendered that appellee take nothing.

HALE, J., took no part in the consideration and disposition of this case.