**MAURICE ANGLY LUMBER COMPANY et al., Appellants.**

v.

**John W. CONVERSE, Appellee.**

No. 3784.

Court of Civil Appeals of Texas.

Waco.

Dec. 8, 1960.

Rehearing Denied Dec. 29, 1960.

Coleman Gay, Austin, Steeger, Dohoney, Jones & Caldwell, Houston, for appellant.

Max Garrett, Fulbright, Crooker, Freeman, Bates & Jaworski, Houston, for appellee.

TIREY, Justice.

This action is one for damages grounded on the breach of an oral contract alleged to have been made September 24, 1956. The verdict of the jury was in most respects favorable to plaintiff and judgment was rendered against both Maurice Angly Lumber Company, a corporation, and Maurice Angly, individually, and judgment against appellants on their cross-action. The judgment is assailed on eight points. We shall consider points one and four together, because they are controlling. They are substantially to the effect that the Court erred in holding:

(1) That there was any evidence of an employment contract between the lumber company and appellee for the period of his life;

(4) In holding that there was evidence that appellants breached or refused to perform any employment contract which appellee had.

A comprehensive statement is necessary. Evidence was tendered to the effect that Maurice Angly Lumber Company is a private corporation and that Maurice Angly is the principal stock-holder, and was engaged in the active management thereof when he and appellee had a conversation with reference to the employment of appellee to work for such company September 24, 1956. On September 27th, appellee wrote Angly:

"Last Monday, when we were together at your Angly Acres, we covered an awful lot of ground in fairly short order dealing with a move, which to me has resulted in my having to make the biggest single decision yet to face me concerning my future. Now I would like for you to know that I appreciate the confidence you have shown in me, and to assure you that I will do everything humanly possible not to disappoint you. I might add that had the offer come from anyone else, I would have turned it down cold. I have all the confidence in the world in what you are undertaking, and your ability to see it through.

"I have not considered this matter lightly, as I do not believe it a healthy thing to be jumping from pillar to post. As you know, I have made several moves in the past eight years, all of which have been of benefit to me in

my present set-up, since I have gained, through these moves, a little broader knowledge of the building material field. I simply mention this by way of letting you know that I consider and intend this to be my last move. With this in mind, and in order that there will be no misunderstanding by either of us as to what was agreed upon concerning my personal remuneration for producing the results that you desire through your Company, I am outlining below the pertinent points that we agreed upon to the best of my recollection. As I have already mentioned, we covered this ground rather rapidly and I stand to be corrected.

"1. My salary is to be $17,500.00 per year; $12,500.00 of which is to be paid out prorata, over a twelve month period. It was not discussed how, or at what time the other $5,000.00 would be paid, but if it is satisfactory with you, just make it payable $2,500.00 each six months. This salary arrangement to continue for a period of two years, at which time we will review the Company economic situation and make whatever adjustment is in order, either up or down, depending upon the results that have been obtained.

"2. The Company to continue to furnish me with an automobile and its expenses. (The automobile I now have can be had at its depreciated value for less than the cost of a new Chevrolet, so we have an obvious solution to that).

"3. Country Club Membership and Angleton Club Membership to be accessible to me and my family.

"4. At your suggestion, we to make a codicil to your will, wherein your estate will not be able to disturb the Company in any way, but rather where the Company can perpetuate the estate. In short, I am not concerned with the manner in which you leave your estate, or have it set up, so long as the Company can continue unhampered. This

particular portion of our conversations is of the utmost importance to me. It is not unheard of for a fellow your age to drop dead, although I certainly don't expect that. I simply do not want to get out on a limb that someone else can saw off behind me. I don't know anything about your will, or how your estate is to be left, but knowing your few remaining heirs, it is obvious to me that your Company would certainly be liquidated by the estate. I remind you of this, as it is certainly something that should be done promptly, in view of your present plans.

"5. We to make up a profit sharing plan through the Company, acceptable to all concerned, and a retirement program. You mentioned a figure of 6% for the profit or bonus sharing plan, whichever you would like to call it. I think this is a minor thing that we can certainly work out, but should be set up as an incentive for all employees to shoot at. This money to remain in the Company, or a good portion of it, as operating surplus.

"The above, in a nut shell form, about covers the points I am concerned with. If you find anything in this letter that is contrary to our discussion, then please let me know. If you find this to be in order, then please acknowledge the original and return to me promptly so I can start getting the hell out of here to go to work."

At the bottom of this letter there was this notation for Mr. Angly's signature:

"Acknowledged:

Maurice Angly."

(Mr. Angly admitted to receiving the foregoing letter but denied signing it. There was some testimony tendered to the effect that Angly said he had signed the letter or he had agreed to sign the letter, and that he was holding the original letter in his possession for his benefit. It may be that a jury issue was raised as to whether Angly

did or did not sign the letter, but no issue was requested or submitted to the jury, and it is our view that this immaterial point was waived by the failure of appellee to request it; however, it is our view that if Angly had signed appellee's letter of September 27th herein referred to, the only effect that such signing would have had would have been to take the oral contract out of the operation of the statute of frauds, but the lifetime contract here contended for would not have been proved). Appellee went to work for the corporation the latter part of October, 1956.

On November 6, 1957, appellee wrote Angly:

"Prior to my selling out of Brunt & Converse Lumber Sales and joining forces with your Company, you and I entered into a contract concerning my position with your Company and the conditions and salary under which I was to occupy that position. At the time we reached the various conditions that we agreed upon, I confirmed them in writing to you so that there would be no misunderstanding on my part or yours. In addition to the particulars concerning me personally, you told me that you had an additional $100,-000.00 available to place at our disposal in the Company to carry out certain plans of re-organization and to help get the business under way. In fact, you even told me that you were prepared to lose $50,000.00 the first year of the operation if necessary to carry out your intended program. You also made this identical statement to Tommie Townsend. Needless to say, it certainly was not my intent to create one dollar loss to the Company through the operation if such could be avoided and I have done everything within my power to hold the losses at a minimum.

"In addition to the above, you told me that you owed the Company personally about $24,000.00, and at no time during our conversation prior to my joining with your Company did you tell me that you owed the Bank $25,-000.00 that you had borrowed and loaned to the Company to retire a portion of your personal debt to the Company and that such loan was secured with Company Stock. In addition, after joining your Company, I became aware of a tremendous personal debt of yours to people other than the Company which, in one way or the other has been *delt* with largely with our Company operating funds. I will include in this the farm which I thought was your personal property. Through the ensuing year following my joining the Company, your personal debt to the Company has risen from twenty four some odd thousand dollars to almost $36,000.00 at this writing and the $25,-000.00 bank note is still outstanding.

"Further, I did not learn of your tremendous debt until I had been with the Company for about a week and one half, at which time I had occasion to draw the first of our agreed pay checks. The Company did not have sufficient funds available for me to cash the check and it was necessary for me to hold the check until it would clear the bank. At this time I started delving into the cash situation with the Company and received the shock of my life. You know what condition existed so there is no need in going over it again here, with this exception. After I had been on board only one and one half weeks, the Company showed a loss through October 1956 of approximately $10,000.00 for the year through October. By the end of December the loss had grown to approximately $24,-000.00 through commit*t*ments that had been made prior to my joining the Company. Prior to learning of the extreme desperate financial condition of the Company, and with your approval and instructions, I had employed two salesmen. It rapidly developed that we could not see these men through with

sufficient time for them to get their gears meshed and under way because we didn't have the finances to carry them. At your instructions, I had to terminate their employment. The balance of my first year with your Company was simply a continuation of conditions that existed the first three months, coupled with the fact that the lumber business has grown increasingly 'worse. Through various economy measures and retrenching, I was able to slow the tremendous loss down to the point where it is not disastrous.

"Now, I am prepared to continue with our original contract agreement and intend to do so, and at the same time I expect you to live up to the letter of the agreement. I did not seek employment with your Company. You made me the proposition and I accepted it and at the time there was no reason for me to believe that you would not do just exactly what you agreed to do. Now, I intend to continue right on with the Company and continue the business to the best of my ability. Knowing the situation at the bank and the almost certain possibility that our loan arrangement is very shortly going to be cut at least in half, it is going to call for a somewhat different approach to our selling lumber and keeping the Company going. You and I have already discussed this and I am now following through with our plans to sell to contractors as well as Lumber Yards. In so doing we can continue to operate and probably at a profit.

"During the month of April, this year, Tommie Townsend and I voluntarily agreed to leave 20% of our contract salary in the Company as operating capital until such time as the Company could repay us, and in so doing enable the Company to present a somewhat better profit and loss picture. During the past year, you have at various times made vague references to our original agreement without once

ever laying it on the line. I have never relieved you of your original contract agreement with me in any way and do not intend to do so. As a result of developments during the past week it is obvious that you certaintly intend, if possible, to sell out the business to W. H. Norris Lumber Company or to anyone else that you may be able to effect a sale with. From my conversation with the Norris people yesterday, it is obvious to me that they intend to purchase the business and only have two hurdles to clear in the process. They are: Getting with you on the exact price and nature in which the transaction will be handled and the approval of their Chairman of the Board.

"As you know, at the end of October I completed my first year with the Company under our agreement, and in accordance therewith, have paid myself the back salary due me along with the five thousand dollar annual payment, of course deducting therefrom my accounts payable plus interest that I owed the Company.

"It has come to my attention since you informed me of the proposition from W. H. Norris Lumber Company of their interest in purchasing the business, that you had contacted Tommie Townsend without first informing me of your intentions, with a view of their buying the business, and, in fact, their interest in the business was brought about through Tommie Townsend. Even that you had offered to compensate Tommie for being able to effect the deal.

"This was in complete violation of our agreement in that you agreed to give me complete control of the business for a period of two years and further agreed to protect such control in the event of your death by executing a new will leaving the Corporation in trust with the present management in control. You executed such a will in

accordance with our original agreement same having been drawn up by Mr. Colemen Gay, Atty., Austin, Texas, and in the presence of Tommie Townsend and Mrs. Del Barto we discussed its terms.

"Although my Attorney has advised that I could probably prevent the sale of the business during the life of my contract, I want you to know that I will not stand in your way and will do everything in my power to cooperate and help you effect the sale; however, it must be clear that in doing so, I will hold you to the letter of our contract and you will be required to pay me the value of the unexpired contract. Maurice, you know me well enough to know that I am not personally for sale. As you know, I sold out a business for you at one time in Corpus Christi and was sold along with the business. I do not propose to be included as a part of your Company assets in the sale of your business. My contract with you is a personal one, which you told me that you personally guaranteed. I want you to keep this in mind in the event that you sell the business. There comes a time in everyones life when they must look out for themselves. You are looking for a way out of your financial *delima* and see a way out through the sale of the business. I gave up a mighty good future and reputation in the lumber business to join your Company on the assumption that you would perform under our contract and with your personal guarantee. I have some sizable responsibilities to my family and in my original letter to you confirming our agreement, I made this very plain to you in that I told you that I proposed that my joining your Company would be my last move and certainly one that would last longer than it now looks as though it will.

"I would advise you, Maurice, not to take this thing lightly and don't make any hasty decisions. I'll be at the of-fice each day, just as I have been for over a year, doing just exactly what I agreed to do. If you have any questions, then you know where to reach me, or if you are not in agreement with what I have said in this letter, then perhaps you had better contact my attorney, Mr. Max Garrett, directly at his office in Houston."

On November 20, 1957, Angly wrote appellee:

"Your letter of November 6, 1957 was received by me several days later, and needless to say I was quite surprised at the contents.

"I won't attempt to cover all of the various things which you mentioned. I would like to say, however, that:

"1. You and I did not have any verbal or written understanding or agreement with regard to your employment which contained the terms outlined by you in your letter of November 6th.

"2. Since you have come with us, the Company has operated at a substantial loss every single month, and as you know, several months ago, in view of the continued losses, we completely re-arranged the initial agreement between you and the Company, none of which is mentioned in your letter of the 6th.

"3. Regardless of the nature of your complaints, I cannot understand why you did not mention them to me or why you decline to discuss them with me instead of referring me to your attorney.

"I think your action in having the bookkeeper write you a check in the amount of over $4,000 and cashing the check before mentioning this matter to me verbally or by correspondence was entirely wrong, and I should like to request that you immediately refund this money to the company and pay the Company any other sums of money

which may be due it by you; and further it is requested that you instruct the bookkeeper in the future that any check payable to you or for your account must be countersigned by the writer.

"In that by admissions of both yourself and the bookkeeper our books are out of balance—and likely have been thruout your current employment by the company—I have employed an auditing firm to begin a complete audit of our affairs. Until the time dependable figures are in my hands it is, in my opinion, a waste of time to go into the matter further. Once the audit is complete, and the figures in my hands, you may count on hearing from me promptly and completely."

On November 22, 1957, appellee wrote to Mr. Angly:

"I have asked Alfred Baecker to hand you this letter when he meets with you at 10:00 o'clock A.M. on the morning of November 23, 1957, and as you will note, this letter is in answer to your letter dated November 20, 1957, received by me today.

"It is obvious that you have no intention individually or as President of Maurice Angly Lumber Company to stand by our solemn agreement of my employment with Maurice Angly Lumber Company, which was particularly described and set forth in my letter to you dated September 27, 1956, and reiterated in my letter to you of November 6, 1957. In view of your breach of the contract, I see no reason whatsoever for me to continue working for Maurice Angly Lumber Company and this is to advise you that because of your breach I consider my employment terminated and will seek to recover damages resulting therefrom by all legal means available.

"Because of your unfamiliarity with the business it may be more profitable to the company to have me remain for a week or two weeks prior to leaving and this is to advise you that if you want me to do this, I will remain for that week or two weeks depending upon your choice, only on the condition that you pay me on the basis of my agreed salary of $12,500.00 per year and the pro-rata share of $5,000.00 annual payment. In this connection you will also be required to pay me my pro-rata share of the $5,000.00 annual payment accrued through the date I leave the business.

"I couldn't help but note your statement that since I came with the company there has been a substantial loss every single month. In response, I think it fitting to reiterate that which was stated in my letter of November 6, 1957, referred to above, to the effect that prior to my coming with the company there was a greater loss per month than has been suffered through the year of my employment, and further, had you made available the $100,000.00 capital which you told me you had available and would put in the company, we could quite probably have shown a reasonable profit each month by developing a competent sales force.

"You will have this letter Saturday morning the 23rd day of November, 1957, and if it is your desire that I continue with the company for a period of one week or two weeks on the basis stated herein, which is and always has been my contract with the company, you should call me at my home, or have Mrs. DelBarto, one of the directors of the company call me either Saturday afternoon or sometime Sunday. Otherwise, I shall have no other alternative but to assume you do not desire that I be present Monday morning at 8:00 o'clock sharp."

We find no reply by Mr. Angly to the foregoing letter.

Thereafter, on December 10, 1957, appellee filed his original petition against the Maurice Angly Lumber Company, in the District Court of Harris County, Texas. Pertinent to the points in question, the petition alleged:

"That on or about the 24th day of September, A.D. 1956, Plaintiff contracted orally with defendant corporation, through Defendant's president, Maurice Angly, who was then and there acting in the capacity as president and with the authority to contract as follows with Plaintiff, to the effect that Plaintiff would become vice-president and general manager of Defendant on or about the last week of October, A.D. 1956. Said contract provided that in consideration of such services Plaintiff was to be paid $17,-500.00 per year, $12,500 of which was to be paid out over a twelve-month period on a pro-rata basis each month with the remaining $5,000.00 to be paid at the expiration of each six-month period or in one annual payment. Plaintiff, according to the contract, was to be paid this salary in such fashion for a period of two years. That in addition to the salary as aforesaid, Defendant was to furnish Plaintiff with an automobile and its expenses as well as a country club membership and membership in the Angleton Hunting & Fishing Club, both of which were to be available to himself and family.

\*   \*   \*   \*   \*   \*

"That Defendant has breached the contract of employment with the Plaintiff whereby Plaintiff would have earned during the year 1957–1958 the sum of approximately $17,500.00. That in addition to said sum Plaintiff has been damaged in the reasonable sum of $12,500.00, representing the damages applicable to Defendant's failure to furnish Plaintiff with a country club membership and Angleton Hunting & Fishing Club membership, for the term of the contract, together with the contingent benefits which could occur and be vested in Plaintiff through the *death during the two-year term of the contract of Defendant's president, Maurice Angly.* (emphasis added) That Plaintiff has theretofore been damaged as a direct result of Defendant's breach of contract in the total sum of $30,-000.00."

The lumber company seasonably filed its original answer and cross-action on December 22, 1957, and by way of special exception averred that plaintiff's asserted cause of action was in violation of subsection 5, of Article 3995, of Vernon's Ann.Civ.St. of Texas, commonly known as the statute of frauds was, therefore, unenforceable. As for construction of the foregoing statute see Hall v. Hall, 158 Tex. 95, 308 S.W. 2d 12, points 1 and 2. Also Gilliam v. Kouchoucos, Tex.Sup., 340 S.W.2d 27. Thereafter, on August 19, 1958, appellee filed his first amended original petition and pertinent to this discussion he alleged:

"During the summer months of the year 1956, Defendant, Maurice Angly, commenced a course of discussions with Plaintiff, John W. Converse, requesting Converse to sell his interest in Brunt & Converse Lumber Sales, Inc. and leave the employ of said corporation and become vice-president and general manager of Defendant, Maurice Angly Lumber Company, a Texas corporation, with home offices in the city of Houston, Harris County, Texas. That these conversations culminated on the 24th day of September, A.D. 1956, when Plaintiff and Maurice Angly who was then and there acting individually and as president of Maurice Angly Lumber Company, agreed with plaintiff, John W. Converse, that if Converse would leave his position with Brunt & Converse Lumber Sales, Inc. and have no further connection therewith and assume the responsibilities and duties of becoming vice-president and general manager of Maurice

Angly Lumber Company for the rest of his life, the said Defendants would pay to Plaintiff the sum of $17,500.00 per year, $12,500.00 of which was to be paid out over a twelve-month period on a pro-rata basis each month with the remaining $5,000.00 to be paid at the expiration of each six-month period or $2,500.00 at the end of the first six months and $2,500.00 at the end of the next six months or in one annual payment of $5,000.00. It was there agreed that the salary of $17,500.00 payable as aforesaid was to be paid to the Plaintiff over a period of two years and at that time the salary was to be increased or reduced in accordance with the requirements of the business, but it was agreed that the performance of Plaintiff was to be for his lifetime."

This is the first time that appellee claimed that his contract of employment was for life.

Appellee went to trial on his second amended original petition filed November 10, 1959, and pertinent to this discussion his allegations as to a life-time contract are substantially the same as set-out in his first amended original petition. However, in this second amended original petition he made Maurice Angly a party defendant, individually, and asked for relief against him as well as the corporation.

Going back to point one: Is there any evidence of an employment contract between the lumber company and appellee for the period of his life? We think the answer is "No". We realize that we must look at this evidence in the light most favorable to the verdict of the jury, and this we have done. But, at the same time, we must bear in mind the following Rule:

" 'When a party testifies to positive and definite facts which, if true, would defeat his right to recover or conclusively show his liability, and such statements are not subsequently modified or explained by him so as to show that he was mistaken, although testifying in good faith, it has generally been held that he is conclusively bound by his own testimony and cannot successfully complain if he is nonsuited or the court directs a verdict against him.' "

(The same rule applies to written admissions). See Welch Veterinary Supply Company v. Martin, Tex.Civ.App., 313 S.W.2d 111, point 3, page 119, n. r. e., and authorities there cited. Needless to say in order for appellee to recover in this cause it was necessary for him to prove the life-time contract he alleged in his amended pleadings, and its breach by appellant. The existence of such a contract was contested from the time it was first asserted, which was almost nine months after the original suit was filed. We have considered this evidence very carefully and it is our view that there is a complete absence of probative evidence of a life-time contract between the parties. As we view appellee's letter of September 27th, which was written by him shortly after he had his oral agreement with Angly, and which expressly stated his view of the contract relationship existing between the parties, and we find nothing in that letter to indicate that appellee was of the view that he was binding himself for the period of his life to work under a specific contract between him and the lumber company, or that Angly was binding the lumber company or himself to a life contract; but on the contrary precludes such view; nor do we see anything in the remaining correspondence had between him and the appellant to sustain the allegation that the contract of employment was for life. We are of the further view that appellee's oral testimony precludes him from claiming a life contract. Appellee testified in part:

"Q. * * * Now, in discussing the agreement that you worked out there, what did Mr. Angly have to say with regard to how long this agreement or this—your working for the

company was to last? A. Well, in that regard I will refer you to my letter which you have read here, *that I considered it, and certainly inferred it* (emphasis added) and we agreed upon that, that he was to change his will in such a way either by a new will or by a codicil to the present will to perpetuate the company in the event of his death, and we did discuss that, and that was very important to me because I am familiar with his background and his years, and so far as we were concerned had he died in the week after I got over there as manager of the company, I certainly would have continued *as such so long as it was deemed advisable by the trustees, and he confirmed that in his will.* (emphasis added).

"Q. Well, you said the trustees—was there a trust effected by Mr. Angly in his will? A. He did have a new will drawn up by Mr. Coleman Gay of Austin, Texas, at my instigation and as the result of our discussions, * * * and the company was to continue with the present management, whomever it might have been, and he so stated in the will that he was picking the present personnel with that in mind. It was to continue—

"Q. Now let me ask you something right there in connection with that. What discussions did you and Mr. Angly have on September 24, 1956, at the farm, Brenham, Washington County, Texas, with regard to this contract lasting for your lifetime? A. Well, Mr. Angly told me that the only thing that he wanted from that point further once I agreed to go over and run the company was just a comfortable livelihood out of the company, and from then on I would have control of the company, and in that regard he made this remark, he said: 'I consider that you are a pretty fortunate fellow, and I wish that at your age someone had offered me the proposition I have offered you wherein you could have complete control for the rest of your life of a company as though it were your own, and manage it and control it without having one nickel invested in it', he says, 'I can't feature anything more desirable.'

"Q. Now, sir, was there any question in your mind or in the way Mr. Angly expressed himself on that occasion but that this contract was to last for your lifetime? A. Why it was definitely to last so long as I was qualified and able to perform the duties, and I so confirmed that to him in my contract."

We think the fact that appellee said he "considered it, and certainly inferred it" brings his oral testimony within the Rule announced in Advance Aluminum Castings Corporations v. Schulkins, Tex.Civ.App., 267 S.W.2d 174, n. w. h. Assuming without deciding that an opportunity of life-time employment was made by appellant to appellee we find nothing in appellee's testimony to the effect that he accepted such offer by promising to work for the corporation for life. Moreover, in appellee's letter of November 6, 1957, he used these words:

"* * * You agreed to give me complete control of the business for a period of two years."

This statement directly contradicts any supposition or inference that might be drawn from appellee's testimony that the contract was for life, and is an admission against interest that is binding upon him. Moreover, appellee, in his original petition, specifically set out that his original contract was oral and that it was for a period of two years, and he alleged the amount of salary he was to receive for the two-year period, and at the end of the two-year period the parties would agree on such other contract of employment and compensation that was to exist between the parties. Such allegation on

the part of the appellee is in strict accord with the facts as he first viewed them, and as he set them out in his letter of September 27th. Appellee in his original petition twice alleged that his contract was for two years. That was not changed until after the appellant had excepted to the pleading on the ground that it contravened the statute of frauds, and the change in appellee's allegations did not occur until August 19, 1958. As we have heretofore stated, when his first amended original petition was filed appellee set out in effect that he did not have a two-year contract, but that on the contrary his contract with the appellant was for the rest of his life. There was no change in the amount appellee sought for damages. He asked for $30,000 in his original petition, and this amount was not changed by his first amended petition, nor by his second amended original petition. We think the record shows without dispute that there was no claim for damages for the first year, and that the claim for damages was based upon appellee's alleged breach by appellant during the second year. But as we understand appellee's position, it is that the letter of September 27th, together with other letters and oral testimony, presents a jury question as to whether or not appellee's contract was for life. We cannot agree with such contention. As we have before stated, when appellee wrote the letter of September 27th, the terms of the oral contract that he relies on was fresh in his mind, and we see nothing in this letter that in the least indicates that he thought he was binding himself for life, nor is there anything in the letter that indicates that he thought the lumber company or Angly, or either of them, were binding themselves for the period of appellee's life. The record shows that appellee was of the view that his contract was for two years when he presented his alleged cause of action to his attorney, because his attorney specifically alleged that the oral contract was for two years. At the end of the two-year period the parties would be free to enter into such other agreement as they might come to

terms on. Neither appellee nor his attorney tendered any explanation on the trial of this cause as to why he was mistaken as to his former views about the length of the contract. We find nothing in the letter that can be taken to mean that appellant had agreed to employ appellee permanently, and that he had agreed to work for the lumber company for the remainder of his life. It is true that the letter evidences a desire on the part of appellee that his connection with the lumber company would be an extended one, but such desire would be perfectly normal on the part of an employee or employer upon the hiring of a general manager. We think there can be no doubt that if the employment contract had been for life that appellee would have set that important fact out in the letter. Moreover, there is no basis for an inference under this record to the effect that appellee would have been willing to agree to work for life if his salary could have been reduced after two years; nor do we think the making of a Will by Angly is sufficient testimony that the jury would have a right to draw the inference that the contract was for life. On the contrary, the fact that it was desirable for Angly to make the will is proof that the duration of the employment contract was to depend on company policy. After all, appellee was being employed by Maurice Angly Lumber Company, a corporation, and if he had a contract for life it would have continued despite the death of Angly. But appellee contends that the letter he wrote on November 6th is evidence of a life-time contract. We cannot agree with that contention. In that letter, among other things, he says:

"* * * I have never relieved you of your original contract agreement with me in any way and do not intend to do so * * * It is obvious that you certainly intend, if possible, to sell out the business. * * *"

Then the letter says:

"This was in complete violation of our agreement in that *you agreed to*

*give me complete control of the business for a period of two years* (emphasis added) and further agreed to protect such control in the event of your death by executing a new will leaving the corporation in trust with the present management in control. * * * "

We think this letter clearly shows that appellee had in mind that his contract was for two years, otherwise he would have said it was for life. As we have previously stated, these letters which we have quoted were written before the suit was filed, and we think each one shows that the parties talked and agreed on a two-year contract; that neither was bound at the end of the two years. Moreover, appellee wrote his letter of November 22nd, which conclusively shows that he had definitely made up his mind to quit his job, and so advised appellants. In the third paragraph of such letter we find this statment:

*"In this connection you will also be required to pay me my pro-rata share of the $5,000.00 annual payment accrued through the date I leave the business."* (Emphasis added.)

The foregoing statement, unexplained, precludes the appellee from claiming a life contract. We see no probative evidence of the meeting of the minds of the parties as to the life contract. Being of the foregoing view it was the duty of the trial court to grant appellants' motion for directed verdict, and having failed so to do, it was the Court's duty to grant its Motion for Judgment Non Obstante Veredicto. It is also our view that under the letters of appellee heretofore set out, and the allegations in his original petition that he is judicially estopped to assert in a later petition that he had a contract for life with the appellants. See Railroad Commission v. Arkansas Fuel Oil Co., Tex. Civ.App., 148 S.W.2d 895, w. ref.; Smith v. Chipley, 118 Tex. 415, 16 S.W.2d 269, 276. In the case last cited the Supreme Court gave approval to the following doctrine:

" * * * a party is not only bound by allegations and admissions in his pleadings, but by admissions or agreement on the facts."

Moreover, our Supreme Court in Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059, 1063, made this statement of the Rule:

" * * * it is the duty of the court to instruct a verdict, though there be slight testimony, if its probative force be so weak that it only raises a mere surmise or suspicion of the existence of the fact sought to be established, such testimony, in legal contemplation, falling short of being 'any evidence.' "

Our Supreme Court has not seen fit to change this Rule. See Continental Cas. Co. v. Fountain, Tex.Civ.App., 257 S.W.2d 338, w. ref. Rounsaville v. Bullard, 154 Tex. 260, 276 S.W.2d 791.

Is there any evidence that appellants breached or refused to perform any employment contract which appellee here asserts? We think the answer is "No." Needless to say it was appellee's burden to show a breach of the contract, and this he undertook to do by tendering in evidence a series of three letters, which we have heretofore set out. The first letter was from appellee to Angly dated November 6, 1957; the second letter is Angly's reply of November 20th, which is claimed to constitute the breach of the contract. Letter No. 3 was written by appellee to Angly after appellee received Angly's letter dated November 20th. In the letter of November 6th, appellee stated that he understood that Angly was trying to sell the business, and while he did not intend to prevent the sale, as he probably could do, he would insist on full performance of the contract. He stated that it had been agreed that appellee *"would have complete control of the business for two years;"* (emphasis added) that he would continue to perform his duties at the office each day, and if Angly did not agree with the statements in his letter he should perhaps contact appellee's attor-

ney, Mr. Garrett. As we understand appellee's contention, it is that Angly's letter of November 20th constitutes a breach of the contract and it is grounded on the following statement:

"You and I did not have any verbal or written understanding or agreement with regard to your employment which contained the terms outlined by you in your letter of November 6."

Appellee seizes upon the foregoing quote as an unequivocal and complete renunciation of the contract between the parties without just cause. On the day that appellee received Angly's letter, which was November 22nd, he again wrote Angly a letter dated November 22nd, in which he stated in part:

"It is obvious that you have no intention * * * to stand by our solemn agreement of my employment with Maurice Angly Lumber Company which was particularly described and set forth in my letter to you dated September 27th, 1956, and reiterated in my letter to you of November 6, 1957. In view of your breach of the contract, I see no reason whatsoever for me to continue working for Maurice Angly Lumber Company, and this is to advise you that because of your breach I consider my employment terminated and will seek to recover damages resulting therefrom by all legal means available."

As we understand appellee's pleading and his proof, no other breach of the contract is claimed except in the letter of Angly to appellee dated November 20, 1957, and unless this letter constituted a breach of the contract there was none on appellants' part.

It is true that Angly's letter did deny that they had a contract which contained the terms outlined in appellee's letter of November 6th. However, in Angly's letter he did not attempt to discharge appellee or prevent him from working, and needless to say that Angly's denial of the terms of the contract had no effect on the terms themselves. Appellee had the right to continue to work under the terms of the contract as they actually existed, and he could not charge appellant with a breach of the contract because of a controversy over its terms. The contract existing between the parties was being performed at the very time, and as we view the record there is no warrant for the statement that the appellants unequivocally and completely renounced the contract. At that time only a controversy existed between the parties as to the exact terms of the oral contract. No breach occurred until appellee elected to do so as set out in his letter to Angly dated November 22nd. We think the factual situation here is similar to the facts in Provident Savings Life Assur. Society of New York v. Ellinger, Tex.Civ.App., 164 S.W. 1024, w. ref. See also Kilgore v. Northwest Texas Baptist Educational Soc., Tex.Civ.App., 37 S.W. 473; Preston v. Love, Tex.Civ.App., 240 S.W.2d 486, n. w. h. See also 13 Tex.Jur.2d 565, Sec. 310.

■ It follows that it is our view that appellee simply exercised his judgment to quit his job either solely or partially because of a controversy between him and appellants as to the terms of the contract. Since the alleged contract between the parties was oral, surely appellants did not lose their right to contend as to what were the terms and in so doing did not forfeit or breach such contract as was made between the parties. That leads us to say that it is our view that there is no evidence that appellants breached the contract. This view also entitled appellants to an instructed verdict, and failure of the Court to do so, to a judgment Non Obstante Veredicto. In the event we are mistaken in our views heretofore expressed to the effect that there is no evidence to support the jury's findings to the effect that there was a lifetime contract between the parties, or that the appellants breached the contract of employment then and in either event if the

points as to the great weight and sufficiency of the evidence were reached we would hold that the jury's verdict to the effect that the contract was for life is so against the great weight and preponderance of the evidence as to be manifestly unjust; likewise if we reached the points as to the weight and sufficiency of the evidence as to the breach of the contract by appellant, we would hold that the jury's verdict to the effect that appellants breached the contract of employment is so against the great weight and preponderance of the evidence as to be manifestly unjust, and in either event that would require the cause to be reversed and remanded.

The Fifth Point is that the Court erred in rendering judgment against Maurice Angly since appellee waived any right he may have had to recover against him by failing to request issues thereon. It is true that appellee, in his first amended original petition alleged that "actually the corporation, Maurice Angly Lumber Company, is nothing more than Maurice Angly himself and vice versa; * * * Maurice Angly Lumber Company in law and in fact is the alter ego of Maurice Angly and vice versa." A similar allegation was made in his second amended original petition on which appellee went to trial. No issue was submitted to the jury on whether or not Maurice Angly Lumber Company was the alter ego of Maurice Angly, nor do we find that such issue was requested by appellee. We think it is obvious that, appellee by failing to request an issue on whether or not the corporation was Maurice Angly's alter ego, appellee waived any right he may have had to a personal judgment against him. Rule 279 Texas Rules of Civil Procedure. See Wichita Falls & Oklahoma Ry. Co. v. Pepper, 134 Tex. 360, 135 S.W. 2d 79. See also West American Ins. Co. v. First State Bank of Rio Vista, Tex.Civ. App., 213 S.W.2d 298, n. w. h.

It follows that because of the views here expressed appellants' remaining points pass out of the case.

Accordingly, the judgment in favor of appellee is reversed and here rendered that appellee take nothing. The judgment rendered on appellants' cross-action is in all things affirmed. Reversed and rendered in part, and affirmed in part.